SAYRE et al. v. TRUSTEES OF PRINCETON UNIVERSITY et al., Appellants.

Division Two, December 12, 1905.

1. **WILL CONTEST: Conflicting Evidence.** In a suit to contest a will, being an action at law, the appellate court will not weigh the evidence to determine whether or not the verdict of the jury was against the weight of evidence. But the court will examine the testimony to see whether or not there was any substantial evidence to support the verdict.

2. ———: **Testamentary Capacity.** If the testator had sufficient understanding to comprehend the nature of the transaction he was engaged in, the nature and extent of his property, and to whom he desired to give it, and was giving it without the aid

of any other person, he had capacity to make a will, though his conduct in other relations may have been eccentric and peculiar.

3. ———: ———: **Peculiar and Eccentric Conduct.** Where all the evidence clearly shows that testator manifested excellent capacity in managing his business affairs and possessed unusual abilities in dealing with intellectual matters to which he gave his attention, the fact that, after he had become broken in health and had returned to his former home, after a long absence in the Navy and abroad, he was not communicative with his former associates, did not at times seem acquainted with the roads and farms in the community, and at times seemed deeply abstracted and was observed on the street to droop and wildly gesticulate, did not afford any evidence for setting aside his will.

4. ———: ———: **Melancholia.** The testator at the age of twenty-three became afflicted with melancholia, and wandered away from home, changed his name, and claimed where he stopped that he was looking for work, and after three days returned secretly at night. His suffering was shown to be due to financial troubles, apprehension that he would not be able to complete his medical education, overwork in trying to do three years study in one, headache and constipation and general impairment of health, and readily yielded to medical treatment. Afterwards he completed his studies, became an eminent surgeon in the Navy and a scholar of wide learning, and from his earnings saved money which, by his own prudent management, at the time of his death had increased to $45-000. *Held*, that the attack of melancholia did not afford any probative force of a lack of testamentary capacity nineteen years later when he made a will giving nearly the whole of his estate to the endowment of Princeton University.

5. ———: ———: **Insanity of Collateral Kindred.** A statement by testator's father, made at a time when testator was temporarily afflicted with melancholia, nineteen years before the will was made, that a cousin of the father had been insane, with no explanation of the nature of the cousin's insanity, is wanting in probative force of the testator's testamentary incapacity.

6. ———: ———: **Insane Delusion.** Reliance by a physician upon the judgment of distinguished medical specialists who pronounced his obscure abdominal pain to be due to appendicitis, when an operation showed he did not have that disease, but chronic intestinal catarrh, is in no sense an insane delusion. And even if it was, if it did not show aberration with respect to the kind and extent of his property or any false notion as

to the object of his bounty, it was of no probative force to show lack of testamentary capacity.

7. ————: ————: **Experts: Unsound Mind.** The fact that medical experts of great learning testify in answer to hypothetical questions, that the testator was of unsound mind, does not make it incumbent upon the trial court to submit to the jury the question of the testator's testamentary capacity. Medical experts of great learning maintain that a mind diseased on one subject must be classed as unsound; but the law of this State is that a mind may be impaired in one faculty, and practically unimpaired in all others. Derangement of mental faculties does not incapacitate one from making a will, if it does not render him unable to transact his ordinary business, and incapable of understanding the extent of his property and of appreciating the natural objects of his bounty.

Appeal from Lewis Circuit Court.—*Hon. E. R. Mc-Kee,* Judge.

REVERSED AND REMANDED (*with directions*).

*John D. Davis, Joseph W. Lewis, Marchand & Rouse* and *Silver & Brown* for appellants.

(1) After a will has been duly established and the capacity of testator shown by testimony of attesting witnesses, it devolves upon the plaintiff in a will contest case to prove by substantial evidence that when the testator made the will he did not possses the requisite mental capacity. McFadin v. Catron, 138 Mo. 197; Fulbright v. Perry County, 145 Mo. 432; Sehr v. Lindemann, 153 Mo. 276; Riggin v. Westminster College, 160 Mo. 571; Southworth v. Southworth, 173 Mo. 59; Lorts v. Wash, 175 Mo. 487; Hughes v. Rader, 183 Mo. 630. (2) The rule laid down by this court as a test of a testator's mental capacity is that "it is sufficient if the testator knew what he was doing and to whom he was giving his property" (Brinkman v. Rueggesieck, 71 Mo. 553); or that "he had sufficient understanding to comprehend the nature of the transaction that he was engaged in, the nature and extent

of his property and to whom he desired to and was giving it without the aid of any other person'' (Crossan v. Crossan, 169 Mo. 631) ; or that he has ''intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it and the persons or objects he makes the beneficiaries of his bounty'' (Hughes v. Rader, 183 Mo. 703). This case falls within the following, among other, well-considered cases of 'this court: Lorts v. Wash, 175 Mo. 487; Southworth v. Southworth, 173 Mo. 59; Crossan v. Crossan, 169 Mo. 631; Wood v. Carpenter, 166 Mo. 465; Moore v. McNulty, 164 Mo. 111; Riggin v. Westminster College, 160 Mo. 571; Martin v. Bowdern, 158 Mo. 380; Schierbaum v. Schemme, 157 Mo. 1; Aylward v. Briggs, 145 Mo. 604; Fulbright v. Perry County, 145 Mo. 432; Von DeVeld v. Judy, 143 Mo. 348; Cash v. Lust, 142 Mo. 631; McFadin v. Catron, 138 Mo. 197; Farmer v. Farmer, 129 Mo. 530; McFadin v. Catron, 120 Mo. 252; Maddox v. Maddox, 114 Mo. 35; Couch v. Gentry, 113 Mo. 248; Norton v. Paxton, 110 Mo. 456; Wood v. Carpenter, 166 Mo. 466; Crowson v. Crowson, 172 Mo. 691. (3) That plaintiffs failed to produce any substantial evidence tending to show that Dr. Sayre, when he executed the will in question, was mentally incompetent so to do, appears from a number of considerations: (a) The incidents in the life of Dr. Sayre introduced by plaintiffs to make out their case are wholly insufficient to form a basis for an inference of his mental unsoundness. The facts, if true, that he was ''eccentric,'' ''peculiar,'' ''strange,'' ''not sociable,'' ''close in money matters,'' ''very studious,'' ''forgetful,'' and on several occasions seemed ''confused as to locations,'' in no manner affected his testamentary capacity. Cash v. Lust, 142 Mo. 630; Fulbright v. Perry County, 145 Mo. 432; Sehr v. Lindemann, 153 Mo. 276; Riggin v. Westminster College, 160 Mo. 571; Wood v. Carpenter, 166 Mo. 465. (b) The incidents in the life of Dr. Sayre relied on by plaintiffs to estab-

lish his insanity were perfectly consistent with a normal mind and mental health, had no tendency to show his insanity, and the case was improperly submitted to the jury on that issue. Prentis v. Bates, 88 Mich. 567; Von de Veld v. Judy, 143 Mo. 348; Kisher v. Kisher, 120 Iowa 337. (c) The evidence as to the alleged melancholia in 1880 (nearly two decades before the execution of the will) as testified to by Dr. Roscoe, is wholly valueless to show insanity at the latter time. Dr. Brisco himself testifies that the malady speedily yielded to a treatment of calomel and other simple remedies, and there is no evidence to show a recurrence of it. The fact, if true, that a cousin of the testator's father had been afflicted with insanity, had no probative force or tendency to show that Dr. Sayre was of unsound mind. One's insanity cannot be shown by proof of the insanity of his collateral kin. State v. Soper, 148 Mo. 234; Prentis v. Bates, 88 Mich. 584. (d) So the evidence of Dr. Nixon as to the "delusion of appendicitis," is hardly worthy of serious consideration in view of all the evidence in the case, for it clearly appears that Dr. Sayre's ailment was diagnosed by members of the medical profession of the highest standing as appendicitis and that he was operated on by Dr. White, a specialist, for that ailment. Dr. White would hardly have performed the operation unless the symptoms indicated appendicitis. "No belief that has any evidence for a basis is in law an insane delusion." Stull v. Stull, 96 N. W. 220. Besides, Dr. Nixon (to cap the climax of absurdity) testified that "he (Dr. Sayre) did suffer that pain (in the region of the appendix) for some cause—the delusion was simply with reference to the name of the disease." (e) Plaintiff's own witnesses, with scarcely an exception, testified on cross-examination that they were of the opinion that Dr. Sayre was, at the time referred to by them, competent to manage his business affairs. Brinkman v. Rueggeseick, 71 Mo. 556; Jackson v. Har-

din, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; Fraser v. Jennison, 42 Mich. 231. (f) The will itself wholly refutes the contention that Dr. Sayre was insane when he executed it. Wood v. Carpenter, 166 Mo. 465; Martin v. Bowdern, 158 Mo. 379. (4) Nor did the hypothetical questions propounded (over defendants' objections) by plaintiffs to Dr. Nixon and to Dr. Woodson and others, introduced as expert witnesses, help plaintiffs' case, or authorize the submission of the issue of insanity to the jury. Fraser v. Jennison, supra; Prentis v. Bates, 88 Mich. 567; Russ v. Railroad, 112 Mo. 49; Benjamin v. Railroad, 133 Mo. 274; Koenig v. Railroad, 173 Mo. 698; State v. Foley, 144 Mo. 600; Richardson v. Smart, 152 Mo. 627; McClintock v. Curd, 32 Mo. 411; Von de Veld v. Judy, 143 Mo. 348; Turner v. Haar, 114 Mo. 335; Senn v. Railroad, 108 Mo. 142; Mammerberg v. Railroad, 62 Mo. App. 563.

*Clay & Johnson, Robert W. Ray, Sam B. Jeffries* and *W. M. Hilbert* for respondents.

(1) A proceeding under the statute to set aside a will is a proceeding at law. Young v. Ridenbaugh, 67 Mo. 589; Lyne v. Marcus, 1 Mo. 410; Trotters v. Winchester, 1 Mo. 414; Swain v. Gilbert, 3 Mo. 347; Moore v. McNulty, 164 Mo. 111. It is too well settled in this State for argument that if there is any evidence tending to prove the allegations of the petition, it is error to take the case from the jury. Moody v. Deutsch, 85 Mo. 243; Deere Plow Co. v. Sullivan, 158 Mo. 446; James v. Ins. Co., 148 Mo. 15; Sehr v. Lindemann, 153 Mo. 289. (2) Objections to evidence must be specific. State v. Young, 153 Mo. 445. If counsel object to evidence, it is his duty to state the grounds thereof, and if the court, thus advised, overrules his objections, he must, at the time, save his exception. If that is not done the Supreme Court cannot aid him. Kansas City

v. Oil Co., 140 Mo. 475. If the hypothetical question is substantially based on the facts in evidence it is not open to objection. State v. Barber, 74 Mo. 292. Hypothetical questions not including all the evidence may be asked. State v. Privitt, 75 S. W. 457; State v. Baber, 74 Mo. 297; State v. Kring, 64 Mo. 593; Bank v. Scalzo, 127 Mo. 185; State v. Black, 136 Mo. 108; Rogers on Exp. Test. (2 Ed.), 67; Sterns v. Fields, 90 N. Y. 640.

GANTT, J.—This is a proceeding to contest the validity of the will of Dr. John S. Sayre, who died at Monticello, Lewis county, Missouri, on November 29, 1899. The plaintiffs, or contestants, are two brothers and certain nephews and nieces of the deceased. The defendants, or proponents of the will, are sisters of the deceased and other next of kin, the Trustees of Princeton University, George T. Barnes and George W. Marchand, the last named being the executor of the will. The petition alleges that the said paper writing purporting to be the last will and testament of Dr. Sayre was not his last will, but at the time of the execution of the same, he was not of sound mind and memory and was mentally incapable of making a will or other disposition of his property. The Trustees of Princeton University and the two sisters of the deceased, Mrs. Charlotte S. Boorman and Elizabeth Smith, filed a joint answer admitting the execution of the instrument and its attestation and the probate thereof, but denied that the testator was of unsound mind and memory and incapable of making a will, and alleged that he was at the date of said will of sound mind and competent to make said will, and to dispose of his property as he did therein. The minor defendants answered by guardian *ad litem*.

The defendants as proponents introduced the subscribing witnesses, William K. Marchand, J. H. Bland and H. R. McRoberts, who testified that at the request of Dr. Sayre, they signed the same as witnesses in his

presence, and that at the time he was over twenty-one years of age and of sound mind, and then offered the will itself in evidence, which is in words and figures as follows:

"In the name of God, Amen. I, Dr. John S. Sayre, being of sound and disposing mind and memory, do make and publish this 'my last will and testament, as follows:

"Article 1. Regarding the State of Missouri as my home, it being the place of my birth, and the State in which my principal estate is situated, it is my desire and direction that my estate be administered upon under the laws of the State of Missouri.

"Article 2. I direct that any just debts of mine be paid without unnecessary delay, that my funeral expenses be moderate, and that nothing more than a 'marker,' similar to those used for my father and mother, be used as a tombstone.

"Article 3. I give and bequeath and make the following legacies, to-wit:

"Section 1. My brother David E. Sayre being indebted to me in the sum of one hundred dollars, as evidenced by his note of November 30, 1898, at three months from date, I direct that my said note, or balance thereof, be surrendered to him and that my claim against him for said sum be cancelled.

"Section 2. To my brother-in-law, Rev. W. Frank Smith, I give the sum of twenty-five dollars to be used for buying such theological books, as the Rev. G. C. Kall, or in case of his death, the pastor of the First Baptist Church of Monticello, Missouri, may approve— this legacy being upon the condition that the said Rev. W. Frank Smith is sufficiently interested to expend an equal sum of twenty-five dollars to be added to the above amount for the same purpose.

"Section 3. To my sister, Mrs. W. Frank Smith, I confirm the presents of the ivory fan, silk dress and silk handkerchiefs, all from Japan, that I have, pre-

vious to this date, made to her, and in addition give to her the sum of two hundred and fifty dollars to be used toward building a two-story brick kitchen addition to the dwelling where she now resides, or in case of her removal, or in case she prefers otherwise, for any purpose she may select.

"Section 4. To my nephew, John S. Sayre, son of my deceased brother, T. Dolan Sayre, I give my open face gold watch which is an heirloom from my great-grandfather, the Rev. John Stanford, D. D., for whom we were both named— my said nephew not being a namesake of myself. In case of death of said nephew said watch to revert absolutely to my brother, Capt. F. Sayre, U. S. A.

"Section 5. To each of my nieces, Katie K. Sayre, Elizabeth S. S. Boorman, Ruth E. Sayre, Mary Depew Sayer and Elizabeth S. Sayer, I direct that my executor give a moderate present from among the Japanese or other bric-a-brac owned by me.

"Section 6. To my sister, Mrs. Charlotte S. Boorman, I give and bequeath the painting of the Rev. John Stanford, now in the dwelling-house of Mrs. Frank Smith, and request that Mrs. Charlotte S. Boorman use further means to ascertain if the said painting is a real 'Inman.' At the death of Mrs. Charlotte S. Boorman, I request that the said painting be bequeathed to her son Kitchel M. Boorman.

"Section 7. To my sister, Mrs. A. K. Wallin, now of Fulton, Wisconsin, I confirm the cashmere shawl and other gifts presented to her by me during my lifetime, and in addition I give to my sister, Mrs. A. K. Wallin, the sum of one hundred dollars.

"Section 8. To each of my friends, Dr. R. H. Sayre, of New York, George W. Marchand and George T. Barnes, of Monticello, Missouri, I direct that my executors give a handsome present, such as books, a pair of Japanese vases, or a hanging Japanese picture ('Kakemons').

"Section 9. To my brother, Capt. F. Sayre, U. S. A., I give and bequeath all my professional and other books, pamphlets, papers, letters, etc., all articles of clothing, naval or civilian, any professional instruments, and all miscellaneous articles such as those collected in my travels, and not otherwise bequeathed, to dispose of as he thinks wisest. In case any article is not specifically mentioned, the same is to be the property of my said brother. The said articles, clothing, etc., being now located as follows: Two boxes and one trunkful in the basement of the U. S. Naval Hospital, Brooklyn, New York (apply medical director in charge); two boxes and one trunkful in the house of Mrs. Charlotte S. Boorman, and the remainder being in the dwelling-house of my sister, Mrs. W. Frank Smith. To my said brother, Capt. F. Sayre, U. S. A., I give my leopard skin now in the house of Mrs. W. Frank Smith. Also to my said brother, Capt. F. Sayre, U. S. A., I give the sum of one thousand dollars in trust for his daughter Elizabeth S. Sayre, to be invested at compound interest to be presented to her when she reaches the age of twenty-three years. In case of her death, the said sum to revert to my brother, to his sole and absolute use.

"Article 4. I give and bequeath to my friend, George T. Barnes, now of Monticello, Missouri, the sum of five hundred dollars in trust to purchase and fit out a free public library for the town of Monticello. In case of the death of the said trustee, George T. Barnes, the same sum or the proceeds thereof, to be vested in a trustee appointed by the town board of said town of Monticello, Missouri. I suggest that the trustee secure the approval of the librarian of the free public library of Quincy, Illinois (whom I know to be a very experienced person), to the list of books to be purchased, as best suited to the citizens and their children, and the best way to purchase them. I suggest that perhaps the books may be kept in the

public school building in charge of the principal of said public school under such rules as the librarian of the free public library, at Quincy, Illinois, may advise. However, this suggestion is not mandatory and the trustee will use his discretion to make the said library most useful, especially to the young people of said town.

"Article 5. In case that any condition herein is not accepted by the legatee the money is to revert to the residuary legatee hereinafter mentioned. Any articles not accepted by legatees to revert to my brother, Capt. F. Sayre, U. S. A.

"Article 6. I give and bequeath all the rest and residue of my estate, real, personal or mixed, to the trustees of the University of Princeton, at Princeton, New Jersey, as residuary legatee (formerly known as the College of New Jersey, at Princeton, New Jersey), for the purpose of higher education, to endow under the rules and regulations of said trustees, the following fellowships and scholarships, to-wit:

"1st. A college (not University) fellowship of applied chemistry in the John C. Green School of Science. It is to be designated the fellowship of applied chemistry.

2nd. A college (not University) fellowship of applied electricity in the John C. Green School of Science. It is to be designated the fellowship of applied electricity.

"3rd. The balance of my estate, if any, to be used for as many as possible endowed scholarships of one thousand dollars each in the academic (classical) department of said University, which are to be known as the class of 1878 scholarships. The secretary and the treasurer of the class of 1878 of said University, are to be notified (address Prof. H. S. S. Smith, Princeton, New Jersey,) of this bequest and my earnest desire and wish that the said class of 1878 sub-

scribe at least an equal amount for the said class of 1878 scholarships.

"Article 7. I hereby appoint my brother, Capt. F. Sayre, U. S. A., and my friend, George W. Marchand, cashier of the Monticello Savings Bank, of Monticello, Missouri, as executors of this my last will and testament, and request that they be not required to give bond as such executors.

"Article 8. I request my executors to seek the advice and counsel of F. L. Marchand, Esq., of Monticello, Missouri, in case he is living.

"In witness hereof, I have hereunto set my hand and seal this 7th day of August, 1899 .

"DR. JOHN S. SAYRE.    (Seal.)

"The foregoing instrument was at the date thereof signed by the said Dr. John S. Sayre, and by him declared to be his last will and testament in our presence; and at his request, in his presence, and in the presence of each other, we have subscribed our names as witnesses thereto.

"W. K. MARCHAND,
"H. R. ROBERTS,
"J. H. BLAND."

Thereupon the plaintiffs and contestants offered evidence tending to prove the following facts:

Dr. John S. Sayre, the testator, was forty-two years of age, at the time of his death. From his birth to his manhood he lived with his father and mother except when absent at school, at their home about one mile east of Monticello, Missouri. His father's family consisted of his father and mother and seven brothers and sisters. They lived well. At the date of his death his estate consisted of forty-four thousand dollars in notes and bonds, and some miscellaneous articles, and ninety acres of land worth about thirty-five dollars per acre. When about twenty-three years old and in the year 1880, he was afflicted with acute melancholia. A few days prior to the time this affliction be-

came apparent he became distant to the members of his family and persons working upon the farm, and would have but little to say or do with anyone. Prior to this attack he was in the habit of indulging in various amusements with members of the family and the people on the farm, but one day he left home in the afternoon and went out on the farm, where he remained until three or four o'clock in the afternoon, when he was found sitting under a tree, by his brother Thomas D. Sayre, who had been searching for him the greater part of the day. He was taken home by his brother and cared for during the night. The next morning he left home secretly and did not return for three or four days. Posters were put up by the direction of his father in various places in the surrounding country, stating that he had disappeared and requesting aid to find him. During this absence from home he found his way on foot to a farm house about twelve miles from his home, where he requested the owner of the farm to let him remain over night, saying that he was looking for work, and that his name was Steffen, and said that he lived on a farm near Lewiston in Lewis county. He stayed there all night and next morning left the home of the Poagues, and went in an opposite direction from his home. Three or four days afterwards he turned up in the nighttime, and entered the house unknown to the inmates. His father called Dr. Briscoe, a physician, living at Lewistown, to attend him. Dr. Briscoe found him after a careful examination much run down in flesh, depressed mentally, and afflicted with acute melancholia; he complained of headache and insomnia; was not inclined to talk, and when he did talk it was in a hesitating sort of way. It appears that at that time he was laboring under strong mental trouble, the result of financial losses which threatened the completion of his medical education. Dr. Briscoe advised that he should be sent to a sanitarium for mental trouble, but it was decided to give

him treatment at home for a while. Under Dr. Briscoe's treatment he mended and was taken to Dr. Briscoe's house, where the Dr. continued to look after him for three or four weeks. He then returned home, and the tenants and workmen on the farm were advised to keep watch on him to prevent his leaving home again. In his boyhood he first studied under a private tutor, and then attended Monticello Seminary, and afterwards went to Princeton University, going there in 1874 and graduating in the class of 1878. Sometime in the fall of 1880 he went to Ann Arbor University to study medicine, and subsequently went to Bellevue Hospital in New York City, receiving a degree from that institution. From that time he ceased to reside in Lewistown, except on occasional visits, until a few years before his death. He was never married. In the year 1884 he stood an examination for admission as surgeon in the United States Navy, and was admitted and remained in such service for a period of twelve years. Owing to ill health, arising from chronic intestinal catarrh, he was retired from the navy the latter part of the year 1896. Prior to his leaving the navy his ailment was diagnosed by physicians as appendicitis and in the year 1895 he was operated upon at Philadelphia for such malady and his appendix removed. There was evidence tending to show that the appendix was normal and that in fact he did not have appendicitis, and that he had been advised before the operation, by Dr. Osler of Baltimore, and other physicians, that he did not have appendicitis. After the operation he went to Alston Sanitarium in New York City where he was treated by Dr. R. H. Sayre, who is in no way related to him, for mal-nutrition and mal-assimilation of food, in 1894. From the time of his retirement from the navy until his return to Missouri in the fall of 1898, he practiced medicine in New York. In 1898 he was the examiner of applicants for positions in the navy for the United

States government from April to August. In 1898, in November, he and his sister, Mrs. Boorman, came from New York to Missouri to visit his father. He was in ill health. In February, he contracted a cold, which developed into tuberculosis. On August 7, 1899, he wrote the will now in controversy himself. In the fall of 1899, he went to Colorado Springs and received treatment from Dr. Solly for tuberculosis of the lungs and throat; in a month or so he returned to Monticello, and died at the home of his sister, Mrs. Smith, on November 29, 1899, from tuberculosis or consumption. The evidence tended to show that the testator was of high intellectual attainments, was an ambitious student, and his academic and professional training was supplemented by his travels abroad and his service in the navy. "He was a good Latin and Greek scholar, could read and speak French and Spanish, and could converse in Japanese and speak several of the Chinese dialects."

From the time he entered the navy in 1884, he began to save from his salary and loaned his savings at his home in Lewis county, so that at his death he had accumulated about forty thousand dollars in money, besides a farm of ninety-five acres estimated to be worth thirty-five dollars per acre. During the last few years of his life, he spent a considerable portion of his time either at the old homestead or at his sister's Mrs. Smith's, in Monticello.

The evidence on behalf of the plaintiffs tended to show that during this time he was frequently in Monticello, where on various occasions he was observed to be distant and strange and inclined to seclude himself; would frequently be seen with his head bowed as though in deep meditation, making gestures with his hands and talking to himself.

On one occasion he went to the home of Zach Taylor, a tenant on the land of his brother Ferrand Sayre, in the neighborhood where he was raised. He rode up

in front of the house and stopped, remaining there about ten minutes, without saying or doing anything. Mrs. Taylor, having seen him ride up there, finally opened the door, when he asked the whereabouts of her husband. She pointed her husband out to him. Dr. Sayre started towards Taylor, went a part of the way towards him, turned around, without any apparent cause, and returned, passed by the house and rode off without seeing Taylor. A few days after this he returned to Taylor's house and again asked Mrs. Taylor where her husband was. Taylor was in the field in sight of the house, and she pointed him out to the testator. He went a part of the way towards Taylor, again suddenly stopped without any apparent reason, turned around and left the place without speaking to Mr. Taylor.

About the same time he went to the farm of John W. Moore, a mile and a half southeast of Monticello, and insisted that Moore should sell some hogs upon which he had a mortgage, and became excited because Moore would not consent to do so at that time. He turned around and started walking rapidly, he had gone but a few steps when he suddenly stopped, dropped his head as if in a deep study and threw his hands out, making gestures; he stood a few minutes, then suddenly started away, walking rapidly; he repeated this conduct three or four times before he got out of Moore's sight.

On several occasions about this time he was found by J. D. Million, who had known him all his life, standing on the street with his head down as though in deep thought; on one of these occasions when Million went up to him, he turned around and said, "I am waiting for you, will walk to the graveyard with you," which was a short distance away; they went a few steps when he suddenly stopped without any apparent reason, sat down on the sidewalk and said he would go no further. Million testified that his general conduct and demean-

or was very strange to his old friends. In January, 1897, a brother of Dr. Sayre had died, and Million saw the doctor in the graveyard helping dig his brother's grave. Million spoke to him, and asked him if he was not able to hire the grave dug. He had three negroes there helping. He said he did not think there was anything wrong in helping to do it himself.

On another occasion, about August, 1898, he rode up seemingly in a great hurry to Ruben Powel in Monticello, and asked him if he knew of anyone who would buy his farm. Powel told him he did not, but asked him what it was worth. In a very exciting manner, he said it was worth thirty-five dollars per acre, "but I have got to sell it, it has got to go." Powel said to him that he could give him some names of parties in Illinois to write to. He said if he could not get his price he would take theirs, he had to sell it. This was in the fall before he went to Colorado Springs. After that he met Powel and said he had never heard from the Illinois parties. On the occasion of this conversation, Powel said he was in very bad health and his voice was very weak. His unnatural looks attracted his attention. He seemed to be excited and troubled over something. On cross-examination, Mr. Powel said he thought the doctor's ideas of the value of the farm were very good; it was worth thirty-five dollars per acre. Dr. Sayre looked after his own business; so far as he knew, he managed his farm and rented it to people; he never had an agent, and loaned his money on farm mortgages; he always treated the witness with courtesy and politeness, but was retiring and quiet in his manner; never heard of his doing anything that was unkind; the fact that he inquired about a purchaser for his farm, did not strike the witness as strange at all; the only circumstance that he ever noticed as strange in all of his acquaintance with Dr. Sayre was his appearance that time when he spoke of desiring to sell the place.

It was also shown on the part of the plaintiffs that on one occasion in the summer of 1897, T. C. Boudreau observed Dr. Sayre pass his house in the forenoon going down to Mrs. Boorman's place, and saw him riding over her farm at noon; when the witness returned to his house, the doctor was standing by the gate and called to witness, and said he was lost and could not get out; I said, "right here is the gate that you went in this morning," and thereupon he opened the gate and let the doctor through, and went across to another gate and showed him the way out on the public road. On cross-examination this witness testified that the doctor had his money loaned out in Lewis county on farms and chattel mortgages, and after his father's death attended to it himself; he saw him going about like anybody else; attending to business like anybody else; never knew of his having any business transactions which showed that he was not able to manage his own affairs, or that he did not have business judgment or sense to know how to attend to it; that he had never known of his making a mistake as far as dollars and cents were concerned, he always managed to catch them.

George Wooldridge testified for the plaintiffs that he knew Dr. Sayre in his lifetime, and had met him frequently in the last year, and in fact all his life. On the street he was rather distant in his conduct, did not have much to say; he always seemed busy and did not stop to talk or did not stand around much; had noticed him walking alone talking to himself, making gestures with his hands, seemed to be in a deep study. On cross-examination he said that Dr. Sayre was about attending to his business like anybody else; the witness had never had any reason to suppose that he was not able to attend to his business; so far as he knew he was perfectly able to do so.

Thomas Butler (colored) testified that he was one of the negroes who dug Mr. Thomas Sayre's grave.

Dr. Sayre was there and insisted on some one helping; he threw a dozen or perhaps a half dozen shovels of dirt out of the grave. This witness testified that he had seen the doctor making motions with his arms, seemed to be in a deep study; he always treated the witness well, always spoke to him like he knew him.

Orville Banks testified that he saw something un-natural or peculiar in the doctor's actions; he would stand off by himself; never had any business transaction with him in which he acted peculiar; he had a law suit with Dr. Sayre over a note he had given for a horse; "he brought suit against me and I had to pay it. Sometimes he would tell me he wanted me to pay him and at other times he would say he did not need the money." On one occasion he met the doctor driving very slow with his head down; I said, "Good morning, doctor," and he said, "Good morning, can you tell me the way to John Mackey's?" I said, "Yes, but you have passed there." He said he was bewildered, must have been asleep and passed by the place; he ought to have known the country as well as anybody; he had been raised there. I heard his sister joking with him about going to the World's Fair, she said he treated her very nice, bought cheese and crackers on the road to save expenses.

Thomas Wallace testified that Dr. Sayre loaned him some money; at first he told the witness he did not want the principal but only the interest annually, but subsequently he said he was in a tight place and want-ed the money. Witness afterwards paid the note to Dr. Sayre's father. That after telling him that he was in a tight place, witness met him in town and said to him, "Doctor, what about the money?" and he said, "what money?" and I said, "The money I owe you, you told me you needed it badly; if you have got to have it, I will get it up." He says, "I do not need the money." I then told him that he said he was in a tight

192 sup—8

place and had to have it; he said, "I reckon I was dreaming, give yourself no uneasiness about it." On another occasion this witness heard the doctor say to a lady he wanted to get her cow; she said, "Doctor, we have but one cow, it is about all of our living;" he said, "You must pay what you owe me, or give up the cow." We walked on to town together, I thought he talked rather strange, he talked as though he meant it. On cross-examination he said he never knew anything in his transaction that indicated that Dr. Sayre was not able to attend to his business; that when he spoke to the lady he was positive, but not cross.

Dr. George P. Knight testified that he had been a practicing physician for 26 years; met Dr. Sayre occasionally; our relations were friendly as physicians and citizens, and on one occasion he wrote me a letter asking me to call upon him the first time he came to Monticello, as he wanted me to examine him and see whether he had appendicitis or not, he had been examined and was satisfied and would like for me to call and examine him; he thought it was strange that he would call upon a country doctor after the New York specialists had examined him. On cross-examination, he said he was not an expert, and was not testifying as an expert; I simply thought it strange that he would write such a letter as he did to me, I had not held five minutes conversation with Dr. Sayre in twenty years, and was not prepared to give any opinion whether Dr. Sayre's mind was sound or unsound.

John W. Ball testified that he called on Dr. Sayre in August, 1899, in Colorado Springs, and found him in a room probably ten by twelve, which had but one window and one door; the bed was without sheets and there was but one pillow, only one chair in the room and the carpet was worn. Mr. Sam Jeffries asked him why he did not go to a sanitarium, he said it was a little too expensive, that if you were not able to hire nurses they would not treat you right; that the bed

was not fit to sleep in. The evidence, however, showed that in a short time after this he did go to a sanitarium where he was treated by Dr. Solly whose deposition is in the record.

There was further evidence of the same character as the foregoing which it is entirely unnecessary to reproduce.

Plaintiffs introduced four experts on insanity, to whom the following hypothetical questions were put: "Q. Now, doctor, I will ask you in your judgment, and from your knowledge of the medical science, whether or not Doctor John S. Sayre, who was born about forty-five years ago, and who lived with his parents, consisting of his father and mother, until he was a young man and afterwards attended school, visited his home during vacations, and during the time continuously until within the last few years, or until the death of his parents, he made that his home when he was not engaged in business, his ordinary business away from Missouri, and who afterwards resided with his sister in Monticello, Missouri, a short distance from his old home, his old family homestead, and who in the year 1880 was afflicted with melancholia and became rather distant to his family and to the persons working upon the farm for the week prior to this attack of melancholia and who prior to that time being a young man that indulged in the games and pleasantries with the men and boys who were working upon his father's farm; whose father and mother were in comfortable circumstances, the same as his brothers and sisters; his brother, with his father and sister, whom he afterwards lived with, and that he left home in the morning, remaining away all that day until nearly four o'clock in the afternoon, being found under a tree in a sitting position; that he was taken home and cared for and next morning it was found he had left home and remaining away from home on this occasion three or

four days, he came back to the farm house of his father in the night, where he lived; that while he was away upon this occasion he went to a farm house about twelve miles away that was occupied by a gentleman by the name of Poague; that he stayed all night there, stating to them that he was looking for work, and that his name was Steffin, or Stafford, or some such name, and when asked as to whether or not he was related to the Steffins of Steffinsville in this county, he said he was not, that he lived on a farm near Lewistown in this county; on the following morning after staying all night with Mr. Poague, he started out in the direction opposite his home, which was the last seen of him. Three or four days after he left he returned home; after his return home the physician who had practiced in his family and the family of his father was called in and made a thorough examination of his condition, physical and mental; he had lost his flesh, was depressed in mind, and was afflicted with acute melancholia, this physician in this examination being informed by the father of Dr. Sayre, that he had a cousin who was insane; after this the physician who was in charge treated him for a few days when he gradually grew better; Dr. Sayre then went to school and entered into his profession which called him away from home, but returned on various occasions, always coming to his father's home or his brother's home or his sister's, Mrs. Smith's, all of whom lived in the community of the old homestead, and at various times during the last year and a half or two years of his life he was found to be distant, standing by himself, not communicative, his head bowed as though in meditation, making gestures while in this standing position and while walking by himself upon the streets, inclined to a disposition to shun people; that his father a few years prior to his returning home upon the last occasion had made a loan for him to a man by the name of Thomas Wallace, Dr. Sayre afterwards went to Mr.

Wallace and told him that he wanted the money as he needed it, and must have it as he was in a tight place, Mr. Wallace told him he would get it for him in a few days; afterwards and in a short time Doctor Sayre went again to Mr. Wallace and told him he must have his money as he needed it and was in a tight place financially, Mr. Wallace came to Monticello, where he found Dr. Sayre and told him that he did not then have the money but that he would get it for him in a few days; when Dr. Sayre was told this by Mr. Wallace he said he did not want the money. Mr. Wallace then stated that he had told him he wanted it, Doctor Sayre then told him that he had no recollection of making any such request or demand and if he asked him for it he was dreaming, that he knew nothing about it, that he did not care for the money, all he wanted was the interest. That he was afterwards seen upon the place or farm belonging to Mrs. Boorman, in the neighborhood of the old homestead, and had frequently been seen prior to that time in the community, and that upon this occasion he was lost and unable to find his way home, riding across the field, this occurred about 1897; upon another occasion along about the same time he was found on another farm in the same neighborhood of his own, was found upon the public road in his old neighborhood where he had frequently been seen prior thereto making inquires as to where one John Mackey lived, the Mackey farm being situated just across the road from a part of the Sayre farm in the neighborhood of his old home, he was told that he had passed John Mackey's place and would have to go back, he then told the party he must have been asleep. Afterwards, along in the summer time of 1899, he met a man upon the roadside near Monticello by the name of Powel, who lived in Monticello, and with whom he was acquainted, who lived in Monticello or near by, and with whom he was acquainted, Doctor Sayre asked Mr. Powel if he knew anyone that

would buy his seventy acres of land as he must sell it, that he had to sell it, and stated that he thought it was worth thirty-five dollars per acre, but that if he could not get his price he would have to take the other party's price but it must be sold.   Mr. Powel gave him the names of several parties with whom he might correspond and perhaps find a purchaser in that way, and a few days after this occurred Powel met Dr. Sayre again, Doctor Sayre told him he had not heard from the gentlemen whose names he had given him about the purchase of the land, but that he must sell the place.   During the last year and a half or two years of his life while here in the town of Monticello, where he was raised and in this community he would meet his friends and acquaintances upon the street, who would speak to him and sometimes he would recognize them by speaking and sometimes he would not speak to them. His brother, Thomas Dolan Sayre, died in the winter of 1897, and the day after the death of his brother he was seen at work in the cemetery at Monticello digging his brother's grave, he was at work with other parties; that he gave as an excuse for it, there was no harm in it; Doctor Sayre's financial condition was such that it was not necessary for him to have done the work. Afterwards in the summer of 1899, being afflicted with tuberculosis, commonly known as consumption, Doctor Sayre went to Colorado City, Colorado, when he arrived there he selected a cheap boarding room, about ten by twelve feet, this room had one window only, on the east side, it was a back room with a hall leading through to the front part of the building, one door, there was an ordinary bedstead, mattress, bed clothing with no sheets, probably a wash stand, and one pillow case upon the bed, an ordinary carpet upon the floor, the ventilation of the room being very poor, and when asked by Doctor Briscoe why he did not obtain better quarters said it was the cheapest he could find, and

when asked why he did not go to a sanitarium at Colorado Springs, stated that they did not wait upon them properly where a person was not able to employ a nurse, and that he could not afford it; he remained in this room in Colorado City, Colorado, a week or ten days and was induced to leave and go to the sanitarium at Colorado Springs at the earnest solicitations and advice of the two physicians, Doctor Briscoe and Doctor Solly, Doctor Solly being an expert on throat troubles; after remaining at the sanitarium a few days Doctor Sayre came home where he died in the month of November following, it being during the month of August or September that he was in Colorado City, Colorado, and Colorado Springs. Prior to his going to Colorado, and on the 7th day of August, he executed an instrument as his last will and testament.'' And they answered it that in their opinion assuming those facts to be true he was not capable of making a will.

On the part of the defendants, evidence was introduced of his two sisters, the county officers of Lewis county and other citizens of the same locality who knew Doctor Sayre intimately and had the best opportunity to determine his mental status, also associates of his in the navy and of some of the most distinguished physicians in the United States, all of whom testify that Doctor Sayre was not only a man of unusual native mental powers but a man of great learning and skill in his profession, and that from an intimate acquaintance and association with him they had never detected anything bordering on insanity or unsoundness of mind. It was also shown that Doctor Sayre's ailment during his service in the United States Navy had been diagnosed by some of the best and most distinguished surgeons and physicians in the United States as appendicitis.

At the close of the plaintiffs' evidence and at the close of all the evidence, the defendants asked the court to give a peremptory instruction in the nature

of a demurrer to the evidence, which was by the court overruled. And thereupon the court gave instructions to the jury which will be noted as occasion may require during the discussion of the case. Under the instructions of the court and the evidence, the jury returned a verdict that the paper writing propounded was not the last will and testament of Dr. Sayre. Within due time the defendants filed their motion for a new trial, which was heard and overruled, and thereupon the defendants took their appeal to this court.

I. Upon the foregoing statement, was there any substantial evidence authorizing the circuit court to submit to the jury the question whether Doctor Sayre had sufficient capacity to make a will, and to support the verdict of the jury that the said will was not his last will and testament?

A suit to contest a will is an action at law under our system, and this court will not weigh conflicting evidence to determine whether the jury found against the weight of the evidence. [Young v. Ridenbaugh, 67 Mo. 574.] But it has again and again been held that this court will examine the record to see if there is any testimony to support the verdict. [Appleby v. Brock, 76 Mo. 314; McFadin v. Catron, 138 Mo. 227; Hamon v. Hamon, 180 Mo. 685; State ex rel. v. Guinotte, 156 Mo. 520, 521; Crossan v. Crossan, 169 Mo. 631.]

The standard of mental capacity required to sustain a will has been fixed so far as judicial utterances can settle a principle, and it is that the testator must have "had sufficient understanding to comprehend the nature of the transaction that he was engaged in, the nature and extent of his property, and to whom he desired to give it, and was giving it without the aid of any other person." [Crossan v. Crossan, 169 Mo. 641; Brinkman v. Rueggesick, 71 Mo. 553; Couch v. Gentry, 113 Mo. 248.]

It is essential to the proper determination of the issue presented, to keep in mind that all idea of undue influence, fraud or imposition is to be excluded from consideration and that mental incapacity alone is the ground upon which this contest must stand or fall. On the part of the proponents, the subscribing witnesses were old citizens of Lewis county who had known Dr. Sayre all his life, gentlemen whose official positions indicate the esteem in which they are held in that county.     Mr. McRoberts has three times represented his county in the General Assembly of the State, Mr. Bland has been collector of the revenue, and Mr. Marchand is a business man of standing and repute. They all knew Dr. Sayre well and intimately and each testified that he was of sound mind when he executed the will in their presence.     In addition to this prima facie proof, two sisters of Dr. Sayre, Mrs. Boorman and Mrs. Smith, whose precuniary interest was opposed to the establishment of the will, testified to a lifelong acquaintance with their brother, the testator, and to the most favorable opportunities throughout his life to observe his mental condition, and they unite in the opinion that they discovered no trace of mental unsoundness in him, but on the contrary they each regarded him a man of unusual mental attainments and of superior ability.

Doctor S. Edwin Solly, of Colorado Springs, Colorado, was shown to be not only an eminent physician in the treatment of tuberculosis, but an expert in mental diseases.     During the summer of 1899, the testator, Dr. Sayre, sought relief in the climate of Colorado and was under treatment of Dr. Solly.     Dr. Solly testified that Dr. Sayre was under his care from the first time he saw him until he left Colorado.     "His mental condition appeared to be perfectly normal.     He was in my care for treatment of tuberculosis of lungs and throat. He did not suffer from any mental affliction.     I saw him two or three times a week during the time he was

in Colorado Springs, part of the time every day.      I treated his throat quite frequently and had he had any mental trouble, in my opinion I would have discovered it, because he spoke to me freely of his own affairs. He did not come to me as a total stranger.   We had some mutual friends.''

Doctor Philip A. Lovering, a surgeon in the United States Navy, and whose duty as a member of the Medical Board of the Navy Yard was to examine all cases of mental diseases and who had had much experience with mental affections, testified that he had known Dr. Sayre, the testator, since 1887.   They were associated in the naval service, Doctor Lovering being the superior over Doctor Sayre.   Doctor Lovering testified that Doctor Sayre had an excellent, well-trained mind, and rarely acted without deliberation. He was not easily influenced by others.   Was careful in the performance of his duties, was a remarkably well-informed man on a wide range of subjects.   His moral character was excellent, and he was universally respected by his associates.

Rev. Dr. Robert McIlroy testified he and the testator boarded at Mrs. W. F. Smith's during the year 1899.   They were frequently together, ate at the same table and there was nothing in the testator's manners or speech that indicated an unsoundness of mind.

Dr. Albert Weston of New York became acquainted with the testator in 1882 in New York when witness and Dr. Sayre were both assistant physicians on the medical staff at Ward's Island, New York City Asylum for the Insane.   They were intimately associated personally and professionally.   Afterwards Dr. Weston knew Dr. Sayre when he was a surgeon in the Navy at the Brooklyn Navy Yard.   Dr. Weston never saw any indications of an unbalanced mind in the testator, though he was somewhat reticent about his personal affairs.

Dr. Edwards S. Bogert, medical director of the

United States Navy, testified to an acquaintance with the testator, beginning on the China Station in 1885 or 1886 and lasting down to 1895. He testified he was a capable and efficient medical officer, one to be trusted. In all of his acquaintance with him he never saw any signs of mental derangement, his mind was normal.

Joseph Buckley, circuit clerk and ex-officio recorder of deeds of Lewis county, testified to a close acquaintance with the testator the last year of his life. Dr. Sayre was loaning his money on real estate and he spent much time in 1898 and 1899 looking up titles. Mr. Buckley assisted him and he had an excellent opportunity of observing his mental traits. He discovered nothing peculiar or unusual about his conduct; nothing to indicate an unsoundness of mind.

There was much other evidence of similar trend by those who had an opportunity from close association with Dr. Sayre to judge his mental soundness and it all tended to show that he was of sound mind and a close, accurate business man. Notably that of J. G. Farmer, formerly county clerk of Lewis county; J. E. Thompson, judge of the probate court; Dr. Dwight Dickson, of the United States Navy; Dr. R. Sayre of New York, Hayden McRoberts, W. K. Marchand and R. J. McNally.

On the part of the contestants, neither of the brothers of Dr. Sayre or any other member of his family was called to testify to contradict the evidence of his two sisters, Mrs. Boorman and Mrs. Smith, but their case is made up, as indicated by the statement of the evidence accompanying this opinion, of conduct or acts by Dr. Sayre which the witnesses thought "eccentric," "peculiar," "strange," "not sociable," "close in money matters," "very studious," "forgetful," and on one or two occasions "confused as to locations." Much of said testimony is too trivial for discussion, as for instance that Dr. Sayre after his health had failed and he had been retired from the Navy did

not seek the association of men of his age around Monticello, but was reserved and showed a disposition to be alone. When it is considered that he had lost his health and as a consequence his position in the Navy and that in the long absence he had grown away from his early associates there was nothing in the facts detailed by Mr. Million indicating in the slightest degree unsoundness of mind, particularly as Mr. Million closed his testimony by saying, "I believe that the Doctor was capable of looking after his business affairs. I thought him fully capable and competent to look after money matters. I think he kept his mind well enough to know all about his money and how much he had; I never heard of anybody else attending to the Doctor's business except himself." Certainly the whole evidence on both sides demonstrated he was a most careful and successful business man and accumulated a fine estate out of his personal earnings and wise investments. Neither was there any probative significance in the fact that he preferred to stay by himself and "seemed to be thinking or studying," or "talking to himself," or that while superintending the digging of his brother's grave, to do which he had employed three men, he threw out two or three shovels of dirt himself, or that weak and sick as he was, he concluded not to walk any further after starting with Mr. Million. Utterly inconclusive was the circumstance that Dr. Sayre, a physician, went to the drug store and prepared a prescription for his sick brother. There was not the slightest evidence tending to prove that he was not capable of compounding the prescription or that it was in any manner improper.

Of all the evidence introduced by plaintiffs, the strongest circumstance was that nearly twenty years before he executed his will he was afflicted with melancholy growing out of his financial troubles which at the time threatened to deprive him of his medical education, but when Dr. Briscoe's evidence on this subject

is read as a whole and it appears that Dr. Sayre had been making unusual efforts to accomplish his graduation in one-third of the usual time, and that he was run down physically and was suffering from headache and constipation, and that under Dr. Briscoe's treatment his ailments readily yielded and that there was never afterwards any recurrence of melancholy, it is obvious that this circumstance was valueless to support a charge of insanity at the date of the execution of the will, and equally wanting in any probative force was the hearsay statement of Dr. Sayre's father to Dr. Briscoe that a cousin of his (Dr. Sayre's father) had been insane, especially as there was no evidence of the nearness of the relationship and the fact that at most it was collateral and the nature of the insanity or its cause was not developed. [State v. Soper, 148 Mo. 234; State v. Pagels, 92 Mo. 307, 308.]

Much stress was laid upon what plaintiffs denominate "the illusion of appendicitis" which Dr. Sayre entertained prior to his retirement from the Navy in 1896. It is assumed that because it was testified that, although Dr. White of Philadelphia diagnosed the disease as appendicitis but found that the appendix which he removed was normal, it was a baseless delusion on the part of Dr. Sayre to imagine that he was afflicted with appendicitis, and this was made the basis in part of the hypothetical question propounded to the expert physician. That so eminent a specialist as Dr. White considered that the symptoms indicated appendicitis, otherwise he would not have subjected Dr. Sayre to the operation and removed the appendix, seems to have been overlooked by the learned counsel who propounded the question. But aside from this, the basis upon which Dr. Nixon's theory of "a delusion of appendicitis" is built is that just prior to Dr. Sayre's departure for Baltimore in 1897 preparatory to an examination by Dr. Osler, he had requested Dr. Nixon to examine his lungs and expressed a fear that

the long attack of pleurisy had affected his lungs, and because Dr. Sayre went to Baltimore and was examined by Dr. Osler and reported to Dr. Nixon by letter that Dr. Osler said he did not have appendicitis, that therefore he had a delusion on the subject of appendicitis; because, in a word, nothing was said by Dr. Sayre in his letter to Dr. Nixon about his lungs, but he did say Dr. Osler pronounced against appendicitis, and because Dr. White afterwards operated for appendicitis and found the appendix normal, Dr. Sayre must have had a delusion that he had appendicitis. The conclusion of Dr. Nixon was a clear *non-sequitur*, as he says him-self there is absolutely nothing to show that Dr. Sayre did not request Dr. Osler to examine his lungs nor that he had a delusion about having appendicitis. More-over, it did develop that Dr. Sayre was seriously diseased with chronic intestinal catarrh and Dr. Nixon himself testified that Dr. Sayre did suffer pain in the region of the appendix for some cause and his delusion was simply with reference to the name of the disease. Another physician, Dr. Weeks, with whom Dr. Sayre had his office, testified that Dr. Sayre was undecided what his illness was and stated that it was some obscure abdominal pain; that he had consulted a number of physicians in different cities and they were not agreed as to whether he had inflammation of the appendix or not. He was disposed to leave it to the physicians, who decided to operate for appendicitis. To say that a belief by Dr. Sayre, under these circumstances, that he had appendicitis, if he so believed, was an insane delusion is utterly groundless. As said by the Supreme Court of Nebraska in Stull v. Stull, 96 N. W. l. c. 202, "No belief that has any evidence for its basis, is in law an insane delusion." Reliance upon the judgment of distinguished medical specialists is in no sense an insane delusion. But if in the light of all the evidence we could for a moment asume that Dr. Sayre was laboring under a delusion merely as to the

name of the disease from which he was unquestionably suffering and which finally caused his retirement from the Navy, it is obvious that it did not show the slightest aberration with respect to the kind and extent of his property or any false notions as to the objects of his bounty in the most remote degree. Plaintiffs' own witnesses, almost without an exception, testified on cross-examination that Dr. Sayre was entirely competent to manage his business affairs, and that is the matter with which we have to deal at this time. It is obvious to us that, neither single nor collectively, did the various incidents, proved by the plaintiffs to show that Dr. Sayre was of unsound mind and incapable of making a last will, admitting that they were to be accepted as true for the purpose of the demurrer to the evidence, authorize the court to submit the question of incapacity to the jury. None of them, nor all of them together, had any legitimate tendency to show that he was not fully competent to transact his ordinary business and that he did not have in mind all the natural objects of his bounty. If we grant that some of the evidence showed deceased was eccentric or a recluse in the minds of some of his neighbors, still this in no wise incapacitated him to make his will. The will itself was drawn by his own hand and in it he named every natural heir and relative. He omitted not one. The fact that he gave the bulk of his estate to his Alma Mater, Princeton University, is no evidence of insanity. He was a great believer in higher education and cherished a great affection for the University, a sentiment by no means rare among those who have had the benefits of a great University. As said by Judge COOLEY in Frazer v. Jennison, 42 Mich. 206, and often by this court, "Nothing is more unquestionable than that, by the Statute of Wills, it was intended that every man should be at liberty to select the objects of his bounty among his relatives at discretion, or even to pass them

all by if so disposed." [Riley v. Sherwood, 144 Mo. 364; Hughes v. Rader, 183 Mo. 703.]

But it is urged that the experts testified in response to the hypothetical question that Dr. Sayre was of unsound mind. Medical men of great learning maintain that a mind diseased on one subject must be classed as unsound, but. the law of this State is too well settled to be gainsaid that a man's mind may be impaired in one faculty and practically unimpaired in all others. Derangement of mental faculties does not incapacitate one under our laws from making a will, if it does not render him unable to transact his ordinary business, and incapable of understanding the extent of his property and of appreciating the natural objects of his bounty. We have incorporated the principal hypothetical question propounded to the experts and it is apparent that many, if not all, of the facts assumed, are entirely consistent with mental soundness. Those that tended in the least to show aberration were wholly detached from the more pertinent and important evidence which completely negatived the evidence of eccentricity or any mental unsoundness. It did not include the principal and controlling facts, but we are not bound to accept an opinion based upon facts which the law will not and does not recognize as showing a want of capacity to make a will. Conceding, as already said, that an expert might hold the view that Dr. Sayre was of unsound mind in some respects, the question and answer both fell short of the legal test of capacity to make a valid will in this State. Indeed one of the experts who testified of his own knowledge and acquaintance with Dr. Sayre was asked on cross-examination, "Was his mental condition such as to render him unfit to attend to his business affairs?" and answered, "I would not have thought so at any time I saw him, no sir," thus completely negativing, in a legal sense, his answer to the hypothetical question. As a matter of fact Dr. Nixon seems to have been in er-

Sayre v. Trustees of Princeton University.

ror with reference to this whole matter. He states that he examined Dr. Sayre in 1895, and that the operation for appendicitis upon Dr. Sayre was performed by Dr. White in 1897. In 1895 Dr. Sayre was suffering from appendicitis, as shown by the record of the United States Navy. In the abstract will be found the startling statement taken from the records of the Navy Department that on October 22, 1895, Dr. Sayre was operated upon for appendicitis, and the appendix removed, and yet Dr. Nixon states that as late as 1897 he treated Dr. Sayre and found no indication of appendicitis. If Dr. Nixon examined Dr. Sayre in that year there is one thing that he certainly would have found— the scars of the operation. Dr. Reginald Sayre testified that he found these scars upon the body of Dr. John S. Sayre. The truth of the matter is that Dr. John S. Sayre was operated on for appendicitis, and the appendix was removed in 1895. Dr. Nixon was simply mistaken. Letters of the greatest importance he failed to produce, and yet gave testimony regarding their contents which was contradicted by the undisputed records of the navy. Dr. Nixon was a personal friend of Dr. Sayre. It will be remembered that many of the witnesses for the plaintiffs testified to the fact that Dr. Sayre was unsociable. Dr. Nixon contradicts them on this point, stating he always found Dr. Sayre sociable and most agreeable. We might point out various other inconsistencies in plaintiffs' evidence and the utter insufficiency of the various incidents recited in the hypothetical question to constitute any legal evidence of incapacity to make a valid will, but it would unnecessarily lengthen this opinion. What we have said indicates our view of these matters.

In conclusion, the testimony proves that Dr. Sayre was a careful, painstaking business man; that he was thrifty and saving and through his own efforts he accumulated a small fortune which he handled with

192 sup—9

good judgment. We do not have to depend upon the defendants' testimony to support this statement, as the plaintiffs' witnesses made the same declaration regarding Dr. Sayre's ability in financial matters. Up to the time of his death he alone transacted and attended to his business. He made loans on real estate, examined the titles thereto and attended to all things incident to the management of his property. At one time subsequent to 1895, probably in 1896 or 1897, he was called to take charge of the Monticello Savings Bank for ten days, during the absence of the cashier. Mr. George W. Marchand, who was the cashier of the bank at that time, in his testimony, states that upon his return he found the affairs of the bank in good condition. Here is a man who is not only an able physician, a man of fine education, but according to the testimony of every one who knew him was a capable and wise man of business, even able at times to assume the management and direction of a bank. It must be remembered that Dr. Sayre continued in the management of his business up to the day of his death. It would indeed be strange that a man could do all that he did, that he could gather together a fortune, make loans, examine his titles, deal with people generally and yet not possess the capacity to make a will. The fact is that he possessed this capacity, and his actions in business matters demonstrated beyond a doubt that he was perfectly sound of mind on August 7, 1899. To sanction the setting aside of the will of such a man under such circumstances would in effect be to repeal the Statute of Wills. It is not the province of courts or juries to make men's wills. The evidence in this case is so clear from both sides that Dr. Sayre was entirely competent to make his will, that the circuit court should have, at the close of the evidence, directed the jury to return a verdict that the paper writing propounded as the last will and testament of Dr. Sayre was his last will and testament.

In consonance with these views, the judgment of the circuit court is reversed and the cause remanded with directions to the circuit court to enter judgment that the said paper writing admitted to probate in the probate court of Lewis county and propounded in the circuit court of said county as the last will and testament of Dr. John S. Sayre, deceased, was and is the last will and testament of said John S. Sayre.

All concur.