FRANK BERKEMEIER, GERTRUDE KIMPEL and ELIZABETH MINNEMANN,
Appellants, v. J. F. O. RELLER, Executor of Estate of CASPER
BERKEMEIER, ANNIE KELLER and LITTLE SISTERS OF THE POOR.—
296 S. W. 739.

Division One, June 25, 1927.

1. NEW TRIAL GRANTED: Appeal: Extent of Inquiry: Other Grounds.
It is not the rule in the appellate court that, the trial court having sustained
defendants' motion for a new trial, the inquiry on plaintiffs' appeal must be
confined to a consideration of the one ground assigned by the trial court;
but the rule is that the burden rests upon the appellant to show that the
order cannot be sustained on the ground specified, and respondent may show
that the order, if not sustainable upon that ground, should be sustained on
other grounds.

2. WILL CONTEST: Incapacity: Procedure: Burden: Demurrer to Evi-
dence.  In an action to set aside a will on the ground of testator's testa-
mentary incapacity, the burden rests upon the proponents in the first in-
stance to make out a prima-facie case of his sanity, and that they must do
whether or not contestants attack the will on the ground of his insan-
ity; but the proponents having made out a prima-facie case for the will,
the contestants may then introduce evidence to show want of mental capacity,
and at the close of their case the proponents may introduce further testi-
mony to sustain his sanity; but the burden of proof to sustain his sanity
remains upon proponents throughout the case.  But this course of procedure
does not prohibit the court, at the close of the evidence, to rule that con-
testants have not made a submissible case, and to refuse to submit the
question of testamentary incapacity to the jury.

3. ————: Overruled Demurrer: Waiver: Submission to Jury: Peremptory
Rule.  The proponents of the will, by failing to stand upon their demurrer
offered at the close of the contestants' case and by going ahead and intro-
ducing further evidence to controvert contestants' claim and evidence, do
not waive their right to question the action of the court in permitting the
jury to pass upon the issue of will or no will.  By such course the proponents
do not waive their right to invoke the judgment of the court upon the whole
evidence, and the contestants have no right to assert that the court cannot
instruct the jury to sustain the will where there is no substantial evidence
to support the only alleged grounds of its invalidity.

4. ————: New Trial: Waiver: Appeal.  Notwithstanding that no demurrer
was offered by proponents at the close of all the evidence and that the court
submitted the issue of will vel non to the jury, and they returned
a verdict setting it aside, the trial court can sustain a motion for a new
trial on the ground that the court erred in failing to instruct the jury to
return a verdict sustaining the will; and the propriety of that ruling is for
review on appeal by the contestants, and will be upheld if in view of the
evidence the case should not have been submitted to the jury.

5. ————: ————: Estoppel: By Instructions Asked and Given.  Their
peremptory instruction offered at the close of contestants' case having been
denied, and their peremptory instruction or demurrer offered at the close of
the evidence having also been denied, the proponents of the will were not
estopped to assert that the evidence was insufficient to submit to the jury
the issue of will or no will, by requesting and receiving instructions per-

taining to that issue and to the capacity of the testator to make a will and the credibility of witnesses; nor was the trial court estopped by such instructions and a verdict for the contestants to sustain proponents' motion for a new trial on the ground that error had been committed in not directing the jury to return a verdict for them. Compelled to go to the jury upon a denial of their final demurrer, proponents, by asking and receiving instructions which stated the issues from their standpoint, did not thereby preclude the trial court from a reconsideration of the whole evidence, or from correcting its own error, nor did they preclude this court upon appeal from deciding whether the trial court erred in sustaining the motion for a new trial.

6. ———: **Prima-Facie Case.** Proof of formal execution of the will, and testimony by the scrivener that he read the will to the testator before he signed it and that he said it was exactly as he wanted it, and of the two witnesses that they were present when testator signed it and saw him sign it, and that they signed it in his presence, and the testimony of the scrivener and of the two witnesses that testator was of sound mind, make a prima-facie case for proponents.

7. ———: **Incapacity: Tests: Intricate Matters.** The test of the mental capacity of testator to make a will is not his ability to deal with intricate and complicated matters, but that degree of mental capacity which enables him to comprehend and understand the ordinary affairs of life.

8. ———: ———: **Giving Benefit of Reasonable Inference to Contestants.** In determining the propriety of the action of the trial court in sustaining a motion to set aside a verdict for the contestants, on the ground that the court erred in refusing to direct the jury at the close of all the evidence to return a verdict finding the paper to be the last will of the testator, it is the duty of the appellate court to give to the contestants the benefit of every inference which a fair-minded jury of ordinary intelligence might legitimately draw from the evidence; but a reasonable and necessary limitation upon that rule is that the evidence to which credence is required to be given must be of such a nature as to afford substantial proof of testator's testamentary incapacity. The jury are not permitted to indulge in forced and violent inferences not flowing reasonably from the evidence.

9. ———: ———: **Physical Suffering: Mental Sluggishness.** The facts that the childless testator, in grave ill-health, suffering much pain and believing that he would never be cured, responded slowly to the inquiries of his relatives upon their occasional meetings with him, complained of his ailments, and in conversations repeated the same questions after they had been answered, are not evidence of testamentary incapacity, where the testimony further shows that he realized his diseased condition, actually managed his affairs, knew what he was doing, knew to whom he was giving his property and made his own decisions about all these things, including his choice of a legatee.

10. ———: ———: **Opinions.** The opinion of one layman that testator was of unsound mind, and the statements of others that they could not just say whether he was of sound mind or of unsound mind, based upon their observations of his personal habits and appearances, but unaccompanied by testimony of any act or fact evidencing incompetency to make a will, have no substantial probative force.

11. ———: ———: **Imperfect Memory: Eccentric Dress.** Imperfect memory resulting from sickness and old age, forgetfulness of names and faces, the repetition of useless questions, reticence, eccentricities in dress and oddities of habit, especially in a testator who has never been married and lived much alone about his place of business, are not evidence of such mental disease as renders him incapable of making a will, when not accompanied by

proof of facts and of acts showing that he was incapable of understanding the ordinary affairs of life and the extent of his property, and of transacting his ordinary business and of appreciating those who would be the natural objects of his bounty.

**12. WILL CONTEST: Imperfect Memory: Expert Opinion: Hypothetical Question: Province of Jury.** Notwithstanding that no objection is made to the hypothetical question propounded to the expert on mental diseases, and that no instruction is given or asked referring to his testimony, or to the facts upon which his statements are based, it is the province of the jury to determine whether the facts hypothesized in the question have been given in evidence or are true, and to say how nearly the question correctly reflected the personality and conduct of the testator as described in the testimony of the witnesses other than the expert; and the court, in passing upon a motion for a new trial, has the same right, the right to conclude that the opinion of the expert that testator possessed a diseased mind lacked probative force.

**13. ———: ———: ———: Partial Mental Impairment.** A man's mind may be impaired in one faculty and practically unimpaired in all others. Derangement of mental faculties does not incapacitate one from making a will, if it does not render him unable to transact his ordinary business and incapable of understanding the extent of his property and of appreciating the natural objects of his bounty. And the opinion of an expert that the impairment of testator's memory and of his moral sense rendered him insane is not a sufficient ground for setting aside his will. [Following Sayre v. Trustees of Princeton University, 192 Mo. 95.]

**14. ———: ———: Expert Opinion Not Based on Evidence.** If the opinion of the expert that testator was insane is based upon the assertion and assumption of facts which did not exist, and which the testimony of the other witnesses shows were not facts, and which for the most part were not assumed in the hypothetical question propounded to him, the trial court does not err in setting aside a verdict for the contestants of the will.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2557, p. 665, n. 9; Section 2662, p. 732, n. 86; Section 2736, p. 785, n. 91. **Evidence,** 22 C. J., Section 601, p. 514, n. 17; Section 823, p. 731, n. 86; 23 C. J., Section 1795, p. 51, n. 77. **Trial,** 38 Cyc., p. 1550, n. 47. **Wills,** 40 Cyc., p. 1004, n. 3; p. 1011, n. 49; p. 1018, n. 94; p. 1021, n. 12; p. 1023, n. 29; p. 1272, n. 58; p. 1285, n. 27; p. 1303, n. 57; p. 1328, n. 17; p. 1330, n. 28; p. 1332, n. 43; p. 1361, n. 90.

Appeal from Circuit Court of City of St. Louis.—*Hon. William H. Killoran,* Judge.

Affirmed.

*Thomas D. Cannon* and *Douglas H. Jones* for appellants.

(1) This court will only consider the correctness of the grounds specified by the trial judge in sustaining the motion for a new trial; if they are unsound, the court will reverse and direct the trial court to enter up judgment on the verdict. Herdler v. Stove & Range Co., 136 Mo. 3; Real Estate Co. v. McDonald, 140 Mo. 605; Millar v. Madison Car Co., 130 Mo. 521; Manthey v. Const. Co. 277 S. W. 930; Kersten v. Hines, 283 Mo. 634; State ex rel v. Thomas, 245 Mo. 73; Crawford v. Stockyard Co., 215 Mo. 394; Bradley v. Reppell, 133 Mo.

560.  (2)  Proponents failed to stand upon their demurrer to contestants' evidence, and put before the jury their evidence, thereby waiving their right to object to the overruling of said demurrer, as it then became the duty of the jury to pass upon the evidence as a whole, and the duty of the court to submit the case to the jury upon the evidence as a whole.  Ehrlich v. Mittelberg, 299 Mo. 284; Burton v. Holman, 288 Mo. 70; Lareau v. Lareau, 208 S. W. 243; Canty v. Halpin, 294 Mo. 96; Whiteaker v. Railroad, 252 Mo. 438; Major v. Kidd, 261 Mo. 607; Cullen v. Atchison County, 268 S. W. 95; State v. Winkler, 273 S. W. 1041.  And this court will set aside the order made by the circuit court sustaining respondents' motion for new trial, and set aside the order of the circuit court setting aside the verdict of the jury, and order the verdict of the jury reinstated and judgment entered on said verdict.  (3)  After respondents' demurrer to the evidence had been overruled at the close of appellants' evidence and at the close of the whole case, respondents' requested instructions numbered 1, 4 and 8 were given. Respondents were thereafter estopped to claim that the evidence was insufficient to go to the jury upon the issues so submitted, and thereby abandoned and waived their demurrer.  Davison v. Hines, 246 S. W. 295; Kinlen v. Railroad, 216 Mo. 166; Spina v. Biscuit Co., 273 S. W. 429; State v. Winkler, 273 S. W. 1043; Ehrlich v. Mittelberg, 299 Mo. 284; Ray v. Marquette Co., 273 S. W. 1078; Ramsey v. Railway, 253 S. W. 1079.  (4)  Proponents failed to make out a prima-facie case of mental capacity by the subscribing witnesses to the alleged will.  It thereupon became the duty of the court to submit the case to the jury, even though contestants produced no evidence whatsoever of insanity.  Rayl v. Golfinopulos, 233 S. W. 1069, 1070; Lindsay v. Shaner, 236 S. W. 323; Bensberg v. Washington University, 251 Mo. 641; Knapp v. Union Trust Co., 199 Mo. 660; Ray v. Walker, 293 Mo. 447; Post v. Bailey, 254 S. W. 71.  (5)  Proponents utterly failed to sustain their burden of proof.  The subscribing witnesses to the will failed to show any knowledge of the mental condition or capacity of testator at any time; and the remaining witnesses for proponents in rebuttal did not carry the burden of proof imposed by law upon them, and utterly failed to prove by the weight of the credible evidence that Berkemeier was of sound and disposing mind and memory.  R. S. 1919, secs. 505, 507; Knapp v. Trust Co., 199 Mo. 640; Rayl v. Golfinopulos, 233 S. W. 1071; Mayes v. Mayes, 235 S. W. 100; Clingenpeel v. Trust Co., 240 S. W. 177; Bensberg v. Washington University, 251 Mo. 641; Chambers v. Chambers, 297 Mo. 512; Manche v. Basket & Box Co., 262 S. W. 1021; Lindsay v. Shaner, 236 S. W. 319; Rock v. Keller, 287 S. W. 759.  (6)  There was ample and substantial evidence introduced by contestants before the jury tending to show that testator was not of sound mind when he executed the paper writing purporting to be his will.  It was the duty of the court to

submit the issues to the jury. Roberts v. Bartlett, 190 Mo. 680, 695; Huffnagel v. Pauley, 219 S. W. 378; Major v. Kidd, 261 Mo. 607; Turner v. Anderson, 260 Mo. 1; Whittlesey v. Gerding, 246 S. W. 311; Burton v. Holman, 288 Mo. 70; Lindsay v. Shaner, 236 S. W. 322; Dunkerson v. Williams, 242 S. W. 657; Frohman v. Lowenstein, 260 S. W. 463; Ehrlich v. Mittelberg, 299 Mo. 284; Knapp v. Trust Co., 199 Mo. 640; Post v. Bailey, 254 Mo. 71; Muller v. Hospital Assn., 73 Mo. 242, 5 Mo. App. 390; Rose v. Rose, 249 S. W. 605; Clingenpeel v. Trust Co., 240 S. W. 177; Everly v. Everly, 249 S. W. 88. (7) In considering whether contestants made a case for the jury, contestants must be given the benefit of every reasonable inference and presumption deducible from the evidence, and that evidence is to be viewed in the light most favorable to contestants. Turner v. Anderson, 260 Mo. 1; Burton v. Holman, 288 Mo. 70; Whittlesey v. Gerding, 246 S. W. 308; Sayre v. Trustees of Princeton, 192 Mo. 95; Whiteaker v. Railroad, 252 Mo. 438; Knapp v. Trust Co., 199 Mo. 640; Teckenbrock v. McLaughlin, 209 Mo. 533; Lindsay v. Shaner, 236 S. W. 319; VanRaalte v. Graff, 253 S. W. 220; Landau v. Pac. Ins. Co., 267 S. W. 370.

*J. L. Hornsby* for respondent Little Sisters of the Poor.

(1)    Appellate courts will not reverse the order granting a new trial if it can be sustained on any ground of the motion, even though not sustainable as grounds specified as record by trial court. Manthey v. Contracting Co., 277 S. W. 927; Chandler v. Gloyd, 217 Mo. 394; Emmons v. Quade, 176 Mo. 22; Bradley v. Reppell, 133 Mo. 560; Crawford v. Stockyards Co., 215 Mo. 394; State ex rel. v. Thomas, 245 Mo. 65. (2) There was no waiver. Defendants complained in their motion for new trial not that the court had refused to sustain defendants' demurrer offered at the close of plaintiffs' case, but that the court had refused at the close of the whole case to instruct the jury to find for defendants. Whiteaker v. Railroad, 252 Mo. 438, 452. "It is settled by numerous decisions of this court that a defendant does not waive his objection to the refusal of the court to give his peremptory instruction in the nature of a demurrer to the evidence by asking further instructions to meet those given on behalf of plaintiff." Everhart v. Bryson, 244 Mo. 507, 516; Torrance v. Pryor, 210 S. W. 431; Koerner v. Glennon, 209 Mo. App. 489; Leahy v. Winkel, 251 S. W. 483. (3) In making out proponents' prima-facie case the witnesses to the will are not the only persons competent to prove its due execution or the sanity of the testator. Southworth v. Southworth, 173 Mo. 59, 72; Martin v. Heidorn, 135 Mo. 608; Mays v. Mays, 114 Mo. 536; Craig v. Craig, 156 Mo. 358; Lorts v. Wash, 175 Mo. 487. (4) The execution of the will was properly and sufficiently proven. It is only necessary that the parties under-

stand that the testator intends the instrument to be his will, that he expects the witnesses to sign it as such, that he sign it or acknowledge his signature in the presence of the witnesses, and that they sign it in his presence under circumstances showing that they understand the purpose and effect of the instrument. Heimbach v. Heimbach, 202 S. W. 1128; Martin v. Bowdern, 183 Mo. 630. (5) Opinions of non-expert witnesses, though admissible under certain circumstances to prove the mental incapicity of the testator, are of no probative force unless the witness qualifies by showing that he knows sufficient facts from which to draw his conclusions. Heinbach v. Heinbach, 274 Mo. 301; Sayre v. Trustees, 192 Mo. 95; Byrne v. Byrne, 181 Mo. 391. (6) Imperfect memory resulting from sickness, forgetfulness of the names of persons one has known, idle questions requiring a repetition of information, personal eccentricities and oddities are not evidence of such mental disease and deterioration as render one incapable of making testamentary disposition of his property. Bensberg v. Washington University, 251 Mo. 641, 658; Southworth v. Southworth, 173 Mo. 59, 72; Winn v. Grier, 217 Mo. 420, 446; Gibony v. Foster, 230 Mo. 106, 131; Hahn v. Hammerstein, 272 Mo. 248. (7) The fact that medical experts testify in answer to hypothetical questions that the testator was of unsound mind does not make it incumbent upon the trial court to submit to the jury the question of the testator's testamentary capacity. Sayre v. University, 192 Mo. 95, 128.

LINDSAY, C.—This is a suit to contest the will of Casper Berkemeier, aged fifty-two years, at the time of his death on March 25, 1922, and a resident of the city of St. Louis. The will in question bore date of January 16, 1922. The writing executed by him was admitted to probate by the Probate Court of the City of St. Louis on April 6, 1922. He was a single man, and left as his sole heirs-at-law his brother and two sisters who are the plaintiffs herein, and his other sister, the defendant, Annie Keller. The will gave to his brother and to each of his three sisters the sum of one dollar, and gave the remainder of his estate to defendant Little Sisters of the Poor, a corporation. His estate, consisting of real and personal property, was shown to be of the value of about $25,000. Plaintiffs did not charge the exercise by anyone of undue influence upon Casper Berkemeier, but the ground of invalidity alleged was that he was from and after the first day of January, 1917, and at the time he signed the paper purporting to be his will, in a weakened condition of mind and body, due to disease, and to medicines and drugs, taken by him to relieve the pains caused by his disease, and was of unsound mind due to his diseased condition and the effect of medicine and drugs, and that at the time he signed the paper he did not understand the extent or the value of his property; did not comprehend who were

his heirs-at-law; did not understand the meaning and effect of said paper writing upon his property or upon the persons who were or might be his heirs-at-law.

J. F. O. Reller, named as executor without bond, was made a defendant, but filed no answer; and it is shown that at the time of the trial the National Bank of Commerce was acting as administrator of the estate, *pendente lite*. Annie Keller filed no answer. Defendant, Little Sisters of the Poor, answered, and prayed that the paper writing be adjudged and declared to be the last will of the deceased. The cause was submitted under instructions given for both parties, and the jury returned a verdict that the paper writing in question was not the last will and testament of the deceased. The court sustained defendant's motion for a new trial, and specified as the reason for so doing, ground six of said motion, which was: "The court erred in refusing to direct the jury at the close of all the evidence to return a verdict finding that the paper writing offered in evidence as the last will of Casper Berkemeier is his last will." Thereupon the court set aside the verdict and judgment, and the plaintiffs appealed.

In view of the nature of the discussion in the respective briefs, it may be well to observe now that after defendants, as proponents of the will, had introduced the testimony of the subscribing witnesses and of Reller as to the execution of the will, and the mental capacity of the testator, plaintiffs offered their peremptory instruction to the effect that, under the law and the evidence, the verdict should be in favor of plaintiffs and against the alleged will, which the court refused to give; that thereupon, plaintiffs introduced their evidence to support their contention that the maker was of unsound mind, and at the close of plaintiffs' such evidence, defendants offered an instruction that under the law and the evidence, the verdict must be that the paper writing offered was the last will of the deceased, which the court refused to give; that thereupon defendants introduced other evidence, upon the question of mental capacity, and at the close of defendants' other evidence, which was also the close of the case, there was offered by plaintiffs a peremptory instruction for a finding that there was no will, and the converse instruction was offered by the defendants, and both said instructions were refused. These various rulings of the court were excepted to at the time by the respective parties.

Briefly stated, the substance of the claim of counsel for appellants is, that the evidence was such as required the issue of will or no will to be submitted to the jury; that the respondents failed to stand on their demurrer to plaintiffs' evidence, put in their own evidence, and it thereby became the duty of the court to submit the case upon the whole evidence; that respondents, after their demurrer at the close of the whole case was overruled, having asked and received instruc-

tions submitting the issue to the jury, can not now say there was not sufficient evidence to support the verdict, and therefore the verdict should be reinstated.

Preliminary to a discussion of those questions, counsel for appellants assert that in determining the question whether the trial court erred in sustaining the motion for a new trial, the inquiry must be confined to the one ground, specified of record, by the trial court.

That is not the rule. The rule is that in sustaining the

**Extent of Inquiry.** motion upon a ground contained therein and specified of record, the action of the court in that behalf is held to be a rejection and an overruling of the other grounds of the motion, and upon appeal, the burden is upon the appellant to show that the court erred in sustaining the motion upon the ground specified; but, the respondent, in defending the action of the court in sustaining the motion, is not confined solely to the ground specified. He may go further and show, if he can, that even if the motion was not properly sustainable upon the ground specified, there are other grounds of the motion under which it should have been sustained; but in such case the burden is upon the respondent to show that the action of the court is sustainable upon such other ground. [Bradley v. Reppell, 133 Mo. 560; Emmons v. Quade, 176 Mo. 22; Crawford v. Stock Yards Co., 215 Mo. 394, 402; Chandler v. Gloyd, 217 Mo. 394; State ex rel. v. Thomas, 245 Mo. 65, 76; Manthey v. Kellerman Contracting Co., 277 S. W. 927.]

Counsel for defendant insist that reversible error was committed in the giving of plaintiffs' Instruction 5, and that under the rule announced in the foregoing decisions, the order sustaining the motion must be affirmed if for no other reason.

I.　The defendants, respondents here, as the proponents, occupied the position of a plaintiff in the respect that upon proponents lay the burden of establishing the offered writing as the will of the deceased. The rule in this State as to the burden of proof, and course of procedure followed in such cases, is stated in Mayes

**Demurrer: Waiver: Compelled Submission.** v. Mayes, 235 S. W. l. c. 105: "In every case contesting a will, proof by the proponents of the will of the sanity of the testator, as well as the due execution of the will, must be made, whether the contestants attack the will on the ground of the insanity of the testator or not. [Major v. Kidd, 261 Mo. l. c. 626, 627; 170 S. W. 879; Byrne v. Byrne, 250 Mo. 632, 157 S. W. 609.] But it is only necessary in the first instance for the proponents of the will to make out a prima-facie case of sanity on his part by proof thereof by the subscribing witnesses or others. Then the contestants must introduce evidence to sustain the grounds of their contest, and if the grounds be want of mental capacity and

undue influence, they must introduce evidence tending to support such grounds. Upon the close of their testimony, the proponents may introduce further testimony to sustain the testator's sanity and disprove undue influence. This has been the uniform practice in this State. But in such a case the burden of proof as to the testator's sanity still remains with the proponents of the will throughout the case, and they have consequently the right to open and close. [Benoist v. Murrin, 58 Mo. 307; Major v. Kidd, 261 Mo. 1. c. 622, 170 S. W. 879; Craig v. Craig, 156 Mo. 1. c. 362, 56 S. W. 1097; Carl v. Gabel, 120 Mo. 283, 25 S. W. 214.]'' The reason of the rule was given and the many prior cases dealing with the question were reviewed in Major v. Kidd, 261 Mo. 607.

The essential claim of counsel for plaintiffs is that the case was one which had to be submitted to the jury; therefore the court erred in setting aside the verdict.

Apart from the contention that the evidence was such as to make submission to the jury obligatory, there are certain other grounds urged upon which it is claimed such submission was mandatory upon the court, and the court could not set aside the verdict. The first of these is based upon the fact that the proponents did not stand upon their first demurrer.

Counsel for appellants argue that the proponents, by failing to stand on their demurrer offered at the close of the plaintiffs' evidence, and by going forward and introducing additional evidence, waived their right to question the action of the trial court in permitting the jury to pass upon the issue of will or no will. In support of that contention they cite: Ehrlich v. Mittelberg, 299 Mo. 284; Burton v. Holman, 288 Mo. 70; Lareau v. Lareau, 208 S. W. 243; Canty v. Halpin, 294 Mo. 96; Whiteaker v. Railroad, 252 Mo. 438; Major v. Kidd, 261 Mo. 607; Cullen v. Atchison County, 262 S. W. 93; State v. Winkler 273 S. W. 1041. These cases do not support the contention made by counsel. The proponents, by their action, did not waive their right to invoke the judgment of the court upon the whole evidence. The propriety of giving the peremptory instruction asked at the close of all the evidence, depended solely upon the state of the evidence as a whole. The fact that proponents had not stood upon their first demurrer, and had gone farther with other evidence, has nothing to do with the question whether the peremptory instruction should have been given, and has no bearing upon the question of the right of this court upon appeal to consider said final demurrer, and the action of the court thereon, in the light of all the evidence. The cases cited by counsel show this. This is a law case, and the rule applicable to the question raised by counsel was stated in Pullen v. Hart, 293 Mo. 1. c. 73, after a review of the cases. It was there said: ''In pure law cases, if defendant demurs at the close of plaintiff's case, he will not be precluded from urging in this

court that on the whole evidence no case was made for plaintiff, although he may not have filed a second demurrer to the evidence at the close of the case. In proceeding after demurrer is overruled he only takes the chance of aiding the plaintiff's case, but loses no other right." In such cases, if his motion for a new trial sufficiently raises the question, he may avail himself of the right upon appeal. We hold therefore that the fact that proponents did not stand upon their first demurrer, and did go on with other evidence, did not require the trial court, merely by virtue of proponents' said action, to submit the case to the jury.

II. It is next insisted by counsel for appellants that because respondents' first peremptory instruction was denied, and their like instruction or demurrer at the close of the whole case was also denied, and respondents thereafter requested and were given their Instructions 1, 4 and 8, they are thereby estopped to claim that the evidence was insufficient to send the case to the jury. Counsel say that respondents, by requesting and receiving these instructions, abandoned their final demurrer, and waived the right to claim that the evidence was insufficient to require submission.

**Estoppel.**

The respondents were defendants in the sense that they were brought into court under process at the instance of plaintiff, but they were plaintiffs, in the sense that being in, the burden was upon them to show that the writing contested was executed with the formalities required by the statute (Secs. 505, 507, R. S. 1919) and that the maker at the time was of sound mind. The last was the issue directly tendered by plaintiffs' petition as the ground of contest, but it was necessary for defendants to establish both.

The plaintiffs had their Instruction 2, which told the jury in effect what would constitute sufficient soundness of mind on the part of Casper Berkemeier, to give him power and entitled him to dispose of his property by will. Their Instruction 3 also in a similar way instructed the jury as to the meaning of the terms "soundness of mind" or "mental capacity" or "testamentary capacity." Plaintiffs' Instruction 5, told the jury the burden of proof was on defendants to show that the deceased signed the writing as his will, and that he was of sound and disposing mind at the time, and unless they found he did sign the paper as his will and was of sound mind at the time, the verdict should be for plaintiffs and against the will.

Defendants' said Instruction 1 told the jury that if they believed from the evidence that Casper Berkemeier signed his name to the instrument alleged to be his will, and that it was attested by two or more witnesses subscribing their names thereto as witnesses in his presence, and at the time he was of sound mind, they should find the instrument was his will. This was the only instruction for de-

fendants submitting the issue. Defendants' said Instruction 4 told the jury that under the law one over twenty-one years of age and of testamentary capacity, as defined in the other instruction, had power to dispose of his property by will in such manner as he might wish and to the exclusion of those who but for his will would be the heirs of his estate, and that the jury should not reject the instrument merely because the disposition of his property therein might seem to the jury unfair, or not in accordance with the view of the jury as to what might be more appropriate. Defendants' said Instruction 8 was of a formal character and was the ordinary instruction telling the jury they were the sole judges of the credibility of the witnesses, and instructing them upon what they might consider in determining the credit to be given, and the weight to be attached, to the testimony of a witness.

Counsel say that having asked and received said instructions after their peremptory instruction was refused, the respondents are estopped to claim the evidence was insufficient; and, that the court erred in setting aside the verdict and granting a new trial on the ground of the insufficiency of the evidence, and cite Davison v. Hines, 246 S. W. 295; Kinlen v. Railroad, 216 Mo. 166; Spina v. Union Biscuit Co., 273 S. W. (Mo. App. 428; State v. Winkler, 273 S. W. (Mo. App.) 1041; Ehrlich v. Mittelberg, 299 Mo. 284; Ray v. Marquette Co., 273 S. W. 1078; Ramsey v. M. R. & B. T. Railroad, 253 S. W. 1079. They also, in a reply brief, call attention to the holding in Torrance v. Pryor, 210 S. W. 430, and refer to Leahy v. Winkel, 251 S. W. 483, a case cited for respondent upon this point. We do not think the rule announced in these cases applies here. The two last named cases were negligence cases, wherein the plaintiff made several assignments of negligence. The ruling in those cases was made in view of the fact that defendant did not challenge the sufficiency of the evidence to support any particular theory, but asked and obtained an instruction submitting the case upon one of the assignments (humanitarian doctrine), the plaintiff having also asked and had an instruction submitting the case upon that issue. The ruling was that thereby the defendant conceded there was evidence sufficient to make that issue one for the jury, and he was estopped to assert the contrary.

Plaintiffs' Instruction 5 submitted the question of will or no will, authorizing a finding for plaintiffs. Defendants' Instruction 1 submitted the question of will or no will authorizing a verdict for defendants. The issue was the issue made by statute, Section 525, Revised Statutes 1919, in cases of this character. We hold that the defendants, in asking and receiving their instruction submitting the very issue involved by the nature of the proceeding and the allegation of the petition, were not estopped from urging here that the court committed no error in sustaining the motion upon the ground

specified. In the cases cited by counsel the motion of the defendant for a new trial was overruled, but in this case the motion was sustained. If counsel are right in their contention, the defendants, obliged to go to the jury by the ruling of the court upon the final demurrer by asking and receiving an instruction which stated the issue from the standpoint of defendants, precluded the trial court from a reconsideration of the whole evidence, and from correcting his own error, if it was an error; and precluded also this court upon appeal from considering the question of the correctness of the action of the trial court in sustaining the motion upon the ground specified. None of the cases cited is an authority for so holding.

III. It is next insisted on the part of appellants that defendants failed to make a prima-facie case of mental capacity, by the subscribing witnesses to the alleged will and it therefore became the

**Testamentary Capacity: Prima-Facie Case.** duty of the court to submit the case to the jury, even though contestants produced no evidence whatever of insanity. It is true that it was incumbent upon the defendants to make out a prima-facie case, and if they failed to do so, it was the duty of the court to sustain the peremptory instruction when offered by plaintiffs. However, it may be observed that plaintiffs, when their offered instruction was refused, went forward with their evidence on the question of mental capacity, and thereby took the chance of aiding defendants upon that question.

Counsel for plaintiffs cite under this head, Rayl v. Golfinopulos, 233 S. W. 1069; Lindsay v. Shaner, 236 S. W. 318; Bensberg v. Washington University, 251 Mo. 641; Knapp v. St. Louis Union Trust Co., 199 Mo. 640; Ray v. Walker, 293 Mo. 447; Post v. Bailey, 254 S. W. 71; Mayes v. Mayes, 235 S. W. 100. These cases, in the particular here under consideration, dealt with situations materially different from that disclosed in the instant case. They are cases, mainly, wherein only one of the attesting witnesses was produced, and the others were not accounted for. In Rayl v. Golfinopulos, only one of three attesting witnesses was produced, and he had no recollection of the testator, or of the transaction of the signing of the will by the testator, or by himself as a witness, and could testify no farther than to identify his own signature. Much the same situation existed in the other cases, and the holding was that the evidence did not meet the requirements of the statute. In this case, in making their prima-facie case, defendants produced both of the attesting witnesses, and also Mr. Reller, who prepared the will at the request of Casper Berkemeier.

In making proof of the due execution and attestation of the will, defendants were not obliged to confine themselves to the testimony of the subscribing witnesses. [Southworth v. Southworth, 173 Mo. 59;

317 Mo. Sup.—40.

Lorts v. Wash., 175 Mo. 487, 503; Craig v. Craig, 156 Mo. 358; Mays v. Mays, 114 Mo. 541.] In referring to the testimony of Reller, and the two attesting witnesses, we take that of Reller first. He testified that he was engaged in the real estate and insurance business, and was a notary public; that he had been acquainted with Casper Berkemeier about forty years, and that in financial and business transactions, Casper Berkemeier advised with him. He mentioned several transactions. He said the draft of the will was made by him at the request of Casper Berkemeier, and the will was written by his stenographer Miss Schumacher, in his office, on the day the will was signed, the 16th day of January, 1922; that previous to this time, Casper Berkemeier had called upon him and told him he was going to the hospital. It appears that Casper Berkemeier had a hernia, and was going to the hospital for an operation. Reller testified that Berkemeier came to him at his office, and told him that he was going to the hospital, and was going to change his will, and stated to him what he wanted put into the will; that he made notes in accordance with what Berkemcier told him, and then had the stenographer write the will accordingly; that after it was written he read it to Berkemeier who said it was just what he wanted; that Casper Berkemeier signed the will in his (Reller's) office in the presence of the attesting witnesses, Mr. Pimperl and Miss Schumacher, who saw him sign the will; that after that was done Berkemeier took the old will, and put it into the wood stove and watched it burn, very anxious to see that it did not escape out the chimney; that this old will was one Berkemeier made approximately three years before; that the new will, after it was signed, was put into an envelope in Berkemeier's presence, and was taken by him. Reller's testimony was that from his acquaintance with Berkemeier, both before and at the signing of the paper, it was his opinion that Berkemeier's mind was sound. Miss Schumacher testified that she had been stenographer and bookkeeper for Reller for about four years, and knew Casper Berkemeier during her said employment up to the time he died; that she wrote the will as instructed by Reller; that Casper Berkemeier signed the will in her presence; that in the presence of Mr. Berkemier she was requested by Mr. Reller to sign as a witness, and did so; that when Berkemeier signed the will she was standing there at that time. She testified that she saw Berkemeier upon his visits to the office; that he had insurance policies, written at the office by her; that he came and on such occasions told her what he wanted; that he talked with Reller; that she saw him after the signing of the will just shortly before he went to the hospital, in Reller's office; that she knew him in a business way, but in other ways never paid much attention to how he looked; that he did not, at the time of the signing of the will, look unusual to her; that he was not a robust appearing man, but she did not pay any attention to whether he was sick or not; that from these things and from

the way he transacted business, he was not of unsound mind. She testified that Pimperl, the other attesting witness, was present when Casper Berkemeier signed the will; that if she remembered rightly, Pimperl went into his store, which adjoined Reller's office, and came back again.

Joseph Pimperl, the other attesting witness, was in the grocery business next door to Reller's office. He testified that he was called by Mr. Reller upon the occasion of the signing of the will; that he had theretofore occasionally seen Casper Berkemeier and knew who he was, but had never talked to him before; that when the witness came into Reller's office, Mr. Berkemeier was present, and Reller asked witness if he knew Berkemeier, and Reller said to him that Mr. Berkemeier was making his will, and would like for him (Pimperl) to be a witness; that when Reller spoke to him the paper was lying on his desk; that Reller handed the paper to Berkemeier, and Berkemeier signed it and Reller said: "Mr. Berkemeier is making his will. You be a witness" and that "he (Pimperl) put his name there." The witness said he talked to Berkemeier a few minutes. Pimperl, on his cross-examination, said he signed before Miss Schumacher signed the paper. He testified that on the occasion of the signing of the will he was not in the office twice, but only once. Pimperl, on cross-examination testified that he previously had seen Casper Berkemeier as he was walking around, but he had never talked business with him; that when he signed the paper as a witness there was no one else present except Berkemeier, Miss Schumacher, Mr. Reller's clerk, and Mr. Reller himself; that he (Pimperl) was there between six and ten minutes; that at the time, Berkemeier, as the witness, an Austrian, put it, "was sober, and looked as good as he could look to me; had his right mind, so I talked to him."

The evidence showed sufficiently the formalities required in the execution of a will, and made a prima-facie case as to the mental capacity of the maker. The latter question was the one dealt with in the testimony for plaintiffs, and the additional testimony afterward introduced by defendants. The formalities in executing the will were sufficiently shown to make a prima-facie case, under the following authorities. [Hughes v. Rader, 183 Mo. 630, 701; Schierbaum v. Schemme, 157 Mo. 1; Martin v. Bowdern, 158 Mo. 379; Heinbach v. Heinbach, 202 S. W. l. c. 1128-9; Carlson v. Lafgran, 250 Mo. l. c. 535.] The question of mental capacity is to be further considered in the light of the additional evidence.

IV. We take up the evidence offered by the plaintiffs to show mental incapacity. Their evidence shows that the father of Casper Berkemeier and of plaintiffs died about 1905, owning at the time

property at the corner of 21st and Salisbury Streets, where he lived,
and where he ran a corner saloon, and a grocery. At
**Evidence of** the death of his father, Casper Berkemeier bought the
**Incapacity.** interests of the other heirs, paying therefor $5,000, and
thereafter, until about 1917, or later, he ran a saloon and grocery
in the property, and thereby accumulated the property he had at
the time of his death. Some nine or ten years before his death it ap-
pears that he tore down one of the two buildings on the property, and
erected a store building with rooms above. For a number of years
prior to about January, 1917, his sister Mary, a widow, and her child,
lived with him in the rooms over the store building and kept house
for him. She died about January, 1917, her child having previously
died. He was strongly attached to this sister and her child. There-
after, Casper moved to a room on the ground floor, which had former-
ly been the kitchen to the building adjacent to the store building.
He let the rooms over the store building, and had his housekeeping
and meals done by one of the tenants. The plaintiffs' evidence was
directed to their contention that after the death of his sister, and
after he began to live in the one-room kitchen, or ''shack'' as some of
the witnesses called it, his health and mind began to fail, his appear-
ance changed, and he became morose, forgetful, neglectful of him-
self, suffered from several serious diseases, was obliged to take much
medicine and undergo treatment of physicians, and came to a con-
dition wherein he was not of sound mind. The evidence was that
for as much as five eyars before his death in March, 1922, he was
afflicted with asthma in a severe form, had syphilis, suffered from
hardening of the arteries, had Bright's disease, and was troubled
with rheumatism and also had a hernia, which became strangulated.
It was for this hernia he went to the hospital in March, 1922. An
operation was performed and he died immediately thereafter.

Henry Minnemann, husband of plaintiff Elizabeth Minnemann, in-
troduced by plaintiffs, testified that he had known Casper Berke-
meier for forty years; that before his sister Mary died, Casper was ro-
bust, and his health in better condition; that shortly after the funeral
of his sister he began to complain of sickness and of the various di-
seases above mentioned; that thereafter his physical appearance
changed, and he took on the look of an old man and spoke of his
diseases and pains, every time the witness saw him; that he formerly
had kept his clothing neat and clean, and afterwards appeared to be
careless, and his clothes looked shabby and untidy; that the furniture
in the room where he stayed was poor and insufficient. He testified
that Casper operated a store until about two years before his death;
that he, as the witness expressed it, ''gave it away to Frank Boehm;
that is, he gave the business away to Frank Boehm about two years
before he died;'' that ''the business failed under Boehm, and Casper
bought it back sixty per cent from the creditors and took back the

business;" that during the time Boehm had the store, Casper worked
about the store. He testified that Casper looked sick, complained of
his troubles, his diseases and pains like an old man, dragged his feet
on the ground; that he first noticed mental sickness about 1921; that
Casper could never lead a conversation and keep on one subject;
was going from one thing to another, changing the subject frequent-
ly, jumping from one thing to another, and witness said his mental
condition was unsound. On cross-examination this witness said the
last time he saw Casper was two months before he died, and before
that he had seen and talked with him in July, 1921. The witness re-
lated the circumstances of seeing Casper in July, 1921, as follows:

"I had gone to the store to see him, and his clerk said he was in
the park, which is about two blocks from the store. I saw him sitting
there on a bench at the fountain, and I came around that way, and
then I stood there, and a cold streak went down my back to see his
condition. He looked very sick; and appeared to be a nervous wreck;
he was looking off in the distance; kind of sitting on a bench, staring
ahead of him; and I don't believe he noticed who I was. He was
staring ahead, and I says: 'Hello, Cap.' He looked up that way
and I said: 'What is the matter, are you alive?' 'O,' he says 'that's
you.' He didn't recognize me until then; and I sat down by him
for about ten minutes and he talked about his troubles; and said
his condition was getting worse; that he had to go to the park to
rest; that he couldn't get any rest at home. I asked him why he
didn't go to a hospital. He said: 'I don't want them to kill me
there.' I says, 'They don't kill people there, they generally cure
them.' And he said: 'I imagine they kill them; I don't want to go.'
He said he was getting worse all the time; and that the aches and
pains were getting powerful and I asked him again why he had given
his business away, and he said, 'Just for fun. I was there to take
care of the business if I did give it away.'"

Doctor Niebrugge, plaintiffs' witness, testified that he was a gen-
eral practitioner, and was not a specialist in any particular line;
that he had known Casper Berkemeier since the early part of 1901;
that he had often bought groceries from Casper; that he had treated
him professionally, beginning about March 15, 1917. He told of
several attacks of asthma during a period after that, extending up
to March, 1920, which was the date of the last treatment given
by the witness in his professional capacity. He testified that Casper
had syphilis, and hardening of the arteries; also Bright's disease;
that he referred Casper to Dr. Klenk, a specialist, for examination and
treatment for syphilis. His testimony was that the syphilis did not
seem to affect Casper Berkemeier physically very much; that its exist-
ence was found by the Wassermann test; that during the three
years' period he treated Casper Berkemeier at intervals; that he
cautioned him not to take alcohol, and Berkemeier told him he would

not; that after he stopped treating him professionally in March, 1920, the witness saw him nearly every day, and frequently had a little conversation, lasting a few minutes; that the last time he saw Casper Berkemeier was a day or so before he went to the hospital in March, 1920. He said he did not notice any change in his mental condition up to January, 1922. "I did not notice anything wrong about Cappie Berkemier's mental condition. He was a man of sound mind during those years I have known him. In January, 1922, to the best of my knowledge, he was of sound mind."

Elizabeth Minnemann, one of the plaintiffs and sister of testator, testified that the last time she saw Casper before his death was a week before Thanksgiving, in 1921. She said: "He looked very sick. His face was drawn and he looked yellow-like and his eyes glassy and drooping, and he asked me where I was, and I said I was visiting a friend of mine in the next block and I came by to see how he was, and he told me how he felt, and I advised him to go to some good hospital and be treated and try and get well. He said he did not want to; that he would stay back in the room and live there until spring and then go to Notty's boarding house. I could not exactly say about his mental condition at the time as to whether it was sound or unsound, but the way he acted and the way he spoke I don't think he knowed what he was talking about. I couldn't just say that he was of sound mind." She testified that before that occasion, the last time she saw him was on September 26, 1921; that Casper was always friendly with her; that he would ask the same questions over and over about her children; that he was always complaining of the asthma trouble and Bright's disease; that he was getting much thinner than he formerly had been; looked stooped, and had a hard time making steps. She does not definitely state the times of her conversation other than those referred to before Thanksgiving, in 1921, and in September, 1921. She said: "At the time I couldn't just say what his mental condition was. I didn't know how to take him at times." She testified that he used to drink beer often; that he chewed tobacco a good deal, and smoked a lot; that he always ate by himself; that he slept with a gun under his pillow; that he was close about his money; that he had a nervous disposition and would walk up and down and never sit still and "was everlasting trying to get rid of us whenever we would come to see him." Her testimony was that before their mother's death, which occurred in 1896, he was a regular attendant at the Catholic church, but after their mother's death he did not go to church, and her testimony and that of some others was that he occasionally spoke disrespectfully of the priests.

Frank Berkemeier, one of the plaintiffs, testified that the last time he saw Casper before his death was about November, 1921. At the time he talked with Casper about ten minutes. He said that he looked

weak and his face was puffed on one side; had blotches, and his eyes were blood-shot; that he walked very stooped; seemed like he wasn't strong enough to walk. This witness said: "To my opinion he could not have his right kind of sense; not with his sickness, the way it seemed to me. I could not say he was of unsound mind, but I thought he was. You really couldn't say he was sane either." It does not appear that this brother saw Casper frequently in the years recently before Casper's death. He said he saw him two or three times a year. Describing Casper's method of talking he said: "He would not carry on conversation and would not stick to the subject. He changed from one thing to another. Frequently he would walk up and walk away and then would come back again when in conversation with me. That was his habit."

The testimony of the plaintiffs was that all of them were people of very limited means; that Casper was not unfriendly to them, and in talking to one did not speak of the others in an unfriendly manner.

Mrs. Rose Schmidt testified that she knew Casper Berkemeier before his death; that she saw him in the street car the summer before he died; that they sat together and talked; that he told her he was getting so forgetful that he had to sell his business; that sometimes he was so forgetful that he paid his bills two or three times; that he suffered terribly all the time and was always sick. She stated that at the time mentioned he was thin, but at one time he was a stout man; that his face looked drawn and yellow and he walked like a real old man. She stated: "His mental condition, if indicated by his condition at that time, was weak. I could not say whether he was of sound or unsound mind."

Joseph Minnemann, a son of plaintiff Elizabeth Minnemann, told of Casper referring to the clergy of the Catholic church in a disrespectful manner. This was, however, some years before his death and about the time of the death of Casper's sister Mary. He said the last time he saw Casper he was sick looking; his face seemed to be full of some kind of blotched spots and he drooped over. He does not state anything definite as to when he last saw Casper.

Another witness, Sophia Tiesmeyer, introduced by plaintiffs, stated no more than that years ago Casper had looked real nice, but toward the last he failed, looked bad and was ailing, and when spoken to and asked how he was would always mention his diseases.

Dr. Wm. E. Jost, another witness for plaintiffs, testified that he was called by Casper Berkemeier about March 20, 1922, and consulted concerning the rupture he had in his side. He found a tumor in the left groin, diagnosed as a scrotal rupture. He spoke of various physical ailments he found, absence of reflexes, enlargement of the heart, and other conditions. He said Casper denied having any syphilitic infection. Referring to what he found he said: "The effect of this condition on the mental condition of the patient, de-

pends entirely upon how much of the brain tissue has been involved by the disease." Speaking of it he said: "You could not say that this would produce mental disease because there are many men that live their entire life out; that are active in their business, mentally qualified, that have locomotor ataxia; that it is necessary to wheel then around in a chair." He had not previously seen Casper.

Dr. Charles L. Klenk, plaintiffs' witness, testified that Casper was referred to him for diagnosis as to his condition; that he found him to have syphilis and treated him for that. This was a year or two before the making of the will. He said: "I found that he had a rather poor gait; that he was sluggish and did not seem overly bright at the time, although I could not say that he was far below normal." He further said: "While he was with me, he gained considerably in weight, which was about a year before he died." He said Casper had syphilis in the tertiary stage. He further stated, as the record shows it: "A man in this tertiary stage of syphilis suffering as this man was, would make him morally indiscreet; and its effect on his entire physical system would be very much below par; which conditions would cause them to lack the ability of determining what they should do and what they should not do." On cross-examination he said: "I do not know whether Casper Berkemeier had softening of the brain or not. While I was treating him I could not say that he was of unsound mind." In re-direct examination he said: "I would not say that he was of sound mind."

Dr. A. R. Shreffler, another witness called by plaintiffs, testified that he treated Casper Berkemeier, and saw him from October 1, 1920, to January 17, 1921, and he described the various diseases with which Berkemeier was afflicted. He said: "In disposition and temperament, when I examined him, he was rather down cast and morose and seemed to be very much worried." He further said: "He appeared to be under par physically. His general condition was under par. He improved considerably under treatment." He further stated: "From my observation and acquaintance with Casper Berkemeier during that period, I would not say that he was a man of unsound mind." Later he said: "I wouldn't say that he was absolutely normal mentally. . . . A condition of absolute normality is a relative thing entirely."

Dr. John H. Simon, who testified that he made a special study of nervous and mental diseases, was called as an expert. He had never seen Casper Berkemeier. In answer to a hypothetical question of great length, which assumed to state the history of Casper, and the disposition and drinking habits of his father, and referred to Casper's various diseases, and appearance and conduct as described by the lay witnesses, and the other physicians, he gave it as his opinion that the man so described was of unsound mind. The hypothetical question covers seven pages of record. After answering that the man so de-

scribed was of unsound mind, and answering a few other questions, the witness gave his reasons in a dissertation covering about five pages of the abstract. It had been given in evidence that the father of plaintiffs and of Casper Berkemeier was a hard drinker, and at times a man of violent temper.

Frank Boehm, the man to whom the witness Henry Minnemann referred in saying that Casper had given away his stock of goods, was called by defendants. Boehm had at one time worked for Casper Berkemeier. He testified that Berkemeier did not want to run the grocery store any more, and that about 1917 they made an agreement under which Berkemeier would turn the store over to Boehm. The stock of the store ran something between $800 and $900. Boehm said he paid Berkemeier $100 down, and the agreement was that thereafter he was to pay every year, whatever he could; that he kept the store about two years. He was not able to pay more than the original $100 at the end of about two years, and he had the store somewhat overstocked; that by an agreement with Casper they took an inventory, and he turned the stock back to Casper Berkemeier; that under this agreement he got about $200, which was paid to him, and Berkemeier took the store over again, ran it a short time, began cutting prices, and closing out the stock, and did finally close it out. After this stock was closed out, Berkemeier rented the building to Frank Meyer. Boehm said that during the time he had the store, Casper helped him out in the mornings or evenings, and also later on worked for Meyer when the latter opened a soft-drink parlor in the building. He said that Berkemeier "did not want no salary, and I did not pay him nothing. He got what he wanted in the store and I did not charge him for it." Boehm said he saw Berkemeier every day from 1917 until he died, and he was of sound mind.

Frank Meyer stated that in 1920, after Berkemeier had sold out the grocery store, he rented the room and used the place for a soft-drink parlor; that in 1921, he bought the property from Berkemeier, paying him $5,000; that he made the bargain with Berkemeier himself; talked to him; nobody else. He said that he saw Berkemeier every day from the time he rented the store until the latter's death; that Berkemeier would come in, take care of the business when he went some place else. He said: "Well, so far as I seen, what I think of him, he was not insane; was all the time in good mind, what I seen, he do right to me, and we have no arguments. I can't say he was insane. I am not a doctor and I don't examine people." Asked the direct question whether Berkemeier was of sound or unsound mind, he said: "Well, like I said, he talk to me all the time. He was in right mind; he was not insane."

One or more of plaintiffs' witnesses testified that Casper Berkemeier had said that he wanted to keep the property in the Berkemeier family. One or two witnesses for defendants testified that he spoke

of defendant, Little Sisters of the Poor, and said that whenever he would die everything would go to the Little Sisters of the Poor. Henry J. Sternbruegge, called by defendants, said that he lived on Salisbury Street a few feet from where Casper Berkemeier had his store, and had lived there for more than eleven years; that he saw Berkemeier on an average of three times a week, and talked to him, and from his acquaintance and conversation he was of sound mind. It was shown that nuns, members of defendant Little Sisters of the Poor, occasionally sought contributions from Casper and that he made contributions to them. It is clear from the evidence that he grew up and passed his life at this Salisbury Street corner; seldom left it; cared not much to mix with people other than those, the men he found about the place where he lived and carried on his business, and that during the two years after he sold his grocery business, he was content to stay about and when necessary, help in the store.

Some details of evidence upon certain other matters not heretofore stated, should be noticed. One of the allegations of the petition was that Casper Berkemeier's mind was weak from the use of drugs and medicines taken to relieve pain. Plaintiffs' witness Henry Minnemann, referring to a conversation with Casper, testified: "About the medicines he took, he said he had to take shots in the arm frequently to get rest; that was his very language; when I was visiting him. I saw him about two months before he died; when he was standing at the store on the sidewalk; when I talked to him about fifteen minutes; during which time he complained about feeling bad and his sick condition."

Plaintiffs' witness Dr. Niebrugge testified that upon the occasions when Casper was suffering severely from asthma he would "give him probably a hypodermic injection in the arm which would relieve him in ten to fifteen minutes that he could breathe very nicely." He also stated that he gave him various drugs, "one especially—adrenalin chloride; another, morphine sulphate and glononn or nitroglycerine, which in a very short time relieves this dyspnoea." The asthma for which he treated Berkemeier was spoken of as expiratory dyspnoea. He said he might in the course of the time of his treatments have given five or six of those injections; that he also gave him other injections for other diseases.

The testimony was that during the time Casper was under treatment by Dr. Klenk for syphilis, he was given "between 16 and 18 Salvarsan injections or 606." As to whether Casper gave hypodermic injections to himself, Dr. Niebrugge testified: "I do not know if he administered injections to himself. I saw no evidence of the use of a needle on his body; nor any evidence of it in his conduct or speech." There is evidence that Casper Berkemeier drank beer, but no evidence of his drinking other liquors, nor do any of the witnesses say that they saw him intoxicated.

Plaintiff Elizabeth Minnemann, speaking of the last time she saw him, which was some months before his death, testified: "When he walked he would stagger a little bit like he was weak. He had not been drinking at the last when he did this. He used to drink beer often; I noticed him taking at least ten little flips of beer in an afternoon while I was there."

It was shown that when Casper was a boy of twelve, he fell off of a .fence and hurt his head, but no other particulars about that accident were given. It was also shown that some years before his death, he had a fall in which he hurt his head.

The inventory of his property was introduced in evidence. From this it appears that various stocks held by him to the amount of $3807 were worthless, but it was not shown when he acquired those stocks. Otherwise, the inventory showed that he had bonds in the principal amount of $12,500, with some accrued interest; notes $508, and cash on hand $572, and in addition to this personal property he owned the two-family brick flat which plaintiffs' evidence showed was of the value of $9,000.

It was said that he was neglectful of himself after the death of his sister Mary. His sister, the plaintiff Elizabeth Minnemann, said: "At the time I last saw him he looked clean, but not exactly neat; his clothes kind of hung on him and the sweater coat he had on didn't look very nice. He was kind of close about his money." She said the room in which he lived was clean; that the lady upstairs cleaned it for him, but it was barely furnished.

The foregoing sufficiently states the evidence other than that embodied in the answer of Dr. Simon, to the hypothetical question, with the reasons given by him for the opinion expressed that Casper Berkemeier was of unsound mind.

The action of the court was in effect a finding that there was no substantial evidence to support the verdict.

The hypothetical question and the testimony of the witness stating his reasons, although lengthy, are set out in view of the issue presented. The question is as follows:

"I will ask you to assume that a man who died on March 25, 1922, at the age of 52 had the following history:

"That his father died from drinking, from delirium tremens; that he was a terrible drinker, and got wild and acted almost like a maniac; that at one time this father soaked the house with coal oil and attempted to set fire to it; that at times he mistreated, beat and cursed this son, the hypothetical individual;

"That when a boy, this man whose case you are going to pass on, fell out of a tree and sustained an injury to his head and side; that about 1917 he again had a fall from a wagon, sustaining a serious injury to his head; that this individual throughout his lifetime conducted a grocery and bar up to within approximately three years be-

fore his death, keeping the store from six o'clock in the morning until ten at night every day; that he lived a lonely, solitary life; that he was a bachelor, unmarried; that up until 1917 for some time he lived with a sister, a married sister, and her young son; that he was very much attached to this sister and her son; that during that time they lived in a flat which was kept in a comfortable, clean, neat and sanitary manner; that he was devoted to this sister and child; that the child died and shortly thereafter his sister died, the mother of the child, that had been housekeeping for him. That happened about 1917;

"That thereafter he completely changed his manner of living; he left this comfortable, neatly furnished flat and went to live in a little brick one-room shanty in the yard back of the grocery and saloon, where he lived the life of a lonely, retired individual, without any comforts or necessities of life in this little shack; that it had no electricity, no toilet, no bath, was poorly furnished with a little cot instead of a bed, table and a couple of chairs; in all, just such furniture as was valued at the time of his death, according to an inventory, at $31.25, that being the entire furnishings of this little room;

"That after this date he seemed to lose all interest; that he changed then from a neat and tidy, well-dressed person to a shabby, careless and untidy man; that he changed from one that had been rather miserly to a stage where he practically gave away a store to one of his former clerks, who subsequently failed, and this man had to take the store back and run it, and pay off the debts; that about this time he changed from an active, vigorous, robust man to an inactive, delicate and weak person; that he had formerly had the reputation of being a rather successful business man, but that when he died his inventory showed that all the stocks that he had purchased were practically worthless, amounting to some four thousand dollars; that he became a man who would hide or conceal truths about himself; that he told doctors that were treating him that he never indulged in alcohol, while he in fact did so indulge; that when he was being examined for the operation that resulted in his death, he told the examining physician that he had no syphilitic diseases, whereas he had the most violent case of syphilis; that his character changed from a calm, deliberate person to one of a nervous and excitable temperament; that at one time he had been a member of the Roman Catholic Church, but that at the time of his sister's death he reviled and cursed the Catholic Church, the priests and the sisters of the organization, condemning them in vile language, accusing them as being like a theatre where you had to pay an admission price to get in, accused them of trying to get his money and saying that they would never get a damn cent of his money, but that it would be kept in the family and left to his brother and sisters; that he manifested a marked distrust for doctors and hospitals, said that none of

the doctors knew anything about him, about his condition, and he kept changing from one to another; that at one time he recommended to his sister that she go to a colored doctor in St. Charles to be cured of her rheumatism; that he manifested distrust of any persons and slept with a gun under his pillow; that about this time his memory failed him to such an extent that he could not carry on a connected conversation, but his mind seemed to wander from one thing to another; that he could not remember the names and the persons of his sisters' children when they visited him, but would have to be reminded who they were; that he would ask useless, idle questions about the same thing over and over again; that at the time of his sister's death he was conducted to a former friend's house by one of his tenants to find out the correct address of another sister to whom he said he had telegraphed, and that said telegram had come back, although when told the correct address he said that was where he had sent the telegram; that following this talk, this friend to whose house he had come, went to his store to tell him about communicating with the sister and that when she spoke to him he did not recognize her and finally said, 'Oh,' and that was all that he said about it; that after the sister's death he told several persons that he could not run his store any longer; that his memory was failing him to such an extent that he could not remember whether he had paid bills or not; that he sometimes paid them over again; that it worried him so that he finally gave up the business to one of his clerks who failed and he had to take the same back and pay off the creditors; that he admitted that he was too absent-minded to run the store; that after such date when spoken to in regard to the financial straits of his brother and sisters, he would do nothing for them, but suggested that he himself might be in want; that about 1917 his physical condition and appearance changed from a robust man of about five feet five inches, weighing approximately 200 pounds; that he lost weight and went down to about 125 pounds; that during such period he told various persons that to gain relief from his condition he had to take shots in the arm; that the two sides of his face were uneven, one side was drawn and pulled down to one side, and the other was puffy; that he appeared very nervous, his eyes staring; that he had hard knots in his face over the temples; that he complained of headaches in the lower back part of his head; that his eyes from about such date to the time of his death were red and bloodshot; that the lids dropped down over the eyes like he was sleepy; that when he looked at people his eyes were staring, wild and glassy; that he drank a great deal of beer, from fifty to seventy glasses a day; that he would never eat with anyone and declined invitations to dine with his family; that he did not recognize some people; that at times he would look at his sister and his brother-in-law and would not seem to realize who they were, and when spoken to would jump as if startled and

shocked; that he would then calm down and try to talk to them; that in July, 1921, he was found by his brother-in-law sitting on a park bench staring straight ahead of him; that he looked sick, and that when spoken to by this brother-in-law he was shocked and startled, and then finally recognized who he was talking to, but was in such a sick condition that the brother-in-law was compelled to lead him home; that his gait was very poorly, rather shuffling along, dragging his feet after him; that from the time of his sister's death up to a short time before his own death his physical appearance grew steadily worse; that he got to look like a little old man; that he walked with a slow, dragging gait; that at times he staggered; that during this period from March, 1917, up until December, 1919, he was treated by one physician for a great number of diseases, among them being nephritis and Bright's disease, arterio-sclerosis, aneurism and syphilis; that this physician gave him hypodermic injections of various medicines, consisting in part of morphine, glonoin and nitroglycerin, some arsenic composition, iodide of potassium and mercurial preparations; that thereafter he consulted another physician who described him as a physical wreck, that is, approximately two years before his death, up until within a year of his death, suffering from virulent or tertiary syphilis; having aneurism of the aorta, arteriosclerosis, his gait unsteady, his mental condition not good; that he was sluggish and sorely afflicted with headaches and dizziness, no appetite, sunken eyes, constant headache pains, the pupils of his eyes were unequal and did not react to light; that during such treatment he was treated with approximately eighteen doses of salvarsan or 606, and dosed with iodide of potassium; that thereafter he went to another physician who found—that is, about 1920, up until January 17, 1921—who found him still suffering from syphilis, who found a very high blood presure, Brights disease, aneurism of the aorta, prostatitis, and the urine test showed pus; that this doctor found him suffering with dizziness and unsteady gait; that he was treated by this doctor, among the medicines given being this glonoin, increasing from two drops three times a day to eight drops three times a day; that he was also given some forms of mercury; that thereafter he again consulted a physician about March 22, 1922, bearing in mind that he died three days later, March 25, 1922; that this doctor found his heart condition enlarged, that there was a systolic murmur in the aortic region transmitted along the sternum; that his throat showed the tonsils chronically inflamed, the nose, the septum deviated to the left, in his urine some pus, his eyes did not, the pupils, did not react to light, showing a condition of what is known as the Argyll Robertson pupil; that the reflexes of his knees showed absence of both the right and left knee reflexes; that the prime condition of which the patient complained when he consulted this last physician was an old hernia, or, rather, the doctor found an enlarged tumor,

scrotal hernia or rupture, which he described as being very large and about the size of a two-year-old baby's head; that he told this doctor that he had never had syphilis or gonorrhea or any other diseases except asthma, except the normal childhood diseases; that on January 16, 1922, he went to a real estate man who prepared a will for him, and he signed this paper purporting to give his entire estate, consisting of from twenty to thirty thousand dollars—

"Q. When was that date? A. January 16, 1922, approximately three months before his death—consisting of from twenty to thirty thousand dollars, to the Little Sisters of the Poor, a Roman Catholic charitable organization, and cutting off his brother and three sisters with one dollar each; that this brother and sisters were in rather poor financial condition; that thereafter he made arrangements for his own funeral with his undertaker and then went to a hospital and was operated on for this hernia, which we have described, and died directly after the operation on March 25, 1922:

"Now, Doctor, taking this statement of facts for granted, that is, the truthfulness of the same for granted for the purpose of this hypothetical question, I will ask you to state to the jury what in your opinion as a medical man was the mental condition of this hypothetical individual on January 16, 1922, the date when the paper was executed?"

The witness answered that the individual so described would not be capable of transacting such business as making a will at the time he made it. Upon objection that answer was ordered stricken out and the jury told to disregard it. The witness then stated in answer to the question, that the man was of unsound mind.

Later, over an objection made the witness proceeded to give his reasons for the opinion that such man was of unsound mind, as follows:

"Well, answering your question, I will say that I conclude that he was of unsound mind from the fact that the symptoms and signs related in the hypothetical question picture to me a distinct clinical disease which I know to be a form of insanity, and here are my reasons for that opinion: This man, in the first place, began with a bad family history. The importance of that is this, that all of us nearly are born into the world with a tendency to some disease. Later on certain things happen in life which bring out that disease. For instance, in my own case, I was born with a tendency to rheumatism, therefore I have to avoid colds and rain wet, because both my mother and grandfather had rheumatism. Another man is born into the world with certain nervous affections, and he should avoid certain things like alcohol and excitement which bring on the nervous trouble. Now, this man, it appears from the hypothetical question, had a bad family history, that is, his father was a man of violent temper and alcoholic, a man who from the description given in

the hypothetical question seems to have been a neurotic, a man suffering himself from nervous disorder. It was more than likely therefore that the son should inherit this tendency; aggravating this tendency now was the fact that he had a fall in childhood injuring his cranium. Whether or not that fall had much to do or not with the subject on test I do not know. It is only known that a fall on the head especially in an individual who has a tendency already towards a neurotic disposition, towards insanity, say, aggravates that tendency. As he grew up now, another thing happened to him which is conducive to insanity and that was his solitary and lonely life, and on top of all these tendencies then came the death of the child of Mary and soon after the death of the mother, which was a violent shock superimposed upon an already tottering nervous individual, one whose nervous system was in the balance, ready to go one way or another, was suddenly thrown out of balance by the death of at least one of these persons whom he loved very much. Now, comes the clinical appearance of the case, which shows to a physician or neurologist just what kind of nervous condition it was. One of the great characteristics, if not the greatest of characteristics, in an insane person, is that he suddenly becomes different from himself, that is the old and established idea of insanity, that insanity consists of a deviation from one's normal self. If a man, for instance, has been a miser all of his life and suddenly goes out and spends his money like a drunken sailor, one knows that there is something wrong with him. If a man has been a good church-going, law-abiding, devoted-to-church citizen, and suddenly becomes a rake, a roue, a thief, and a liar, he is beside himself and that is taken as the greatest sign of insanity, and the one which almost inevitably occurs, the change of character from one's normal self. This change took place in this individual soon after the death of the mother and the son of Mary. The hypothetical question states that from being a neat, tidy person, he becomes careless about his clothes and filthy, and that from being a saving and economical person he got out and became a spendthrift who gave away his money and so forth. One of the first signs of approaching insanity is loss of memory. I think it is the first of all. When insanity is beginning to fasten itself upon the unfortunate man, the first thing that we notice is a loss of memory, and that occurred in this case so that the hypothetical individual, the man mentioned here, did not even recognize his relatives at times. The next faculty which suffered was his judgment, which is a higher faculty than memory, and always suffers along with it, and his judgment became bad in business so that he even admitted to others that his judgment was bad and that he had bought a lot of bad stock which could not be sold and that he wasn't in a fit condition to run his business. Then came more or less of a moral change, the fact that a man had been careful about himself and now began to drink ex-

cessively, more so than ever, lied to the doctors about his condition, spent his time in the parks with bums, men with whom in his normal moments he would not associate with; not being able to concentrate his mind on simple questions in conversation with his friends and relatives, asking the same questions over again that had just been asked before by him and paying bills twice, all these showed a mental deterioration which went on in his brain progressively and due to this disease which was softening the cells in his cranium in his brain, I mean to say. His physical loss when he fell from a strong, robust man down to 125 pounds is corroborative evidence of something being wrong in his central nervous system.

"The outstanding physical points pointing to insanity in this case and points which cannot be overlooked or denied were, in the first place, what is known as the asymmetry of his face, the fact that one side of his face was different from another, and the fact the pupils—that he had what is called the Argyll Robertson pupil; which means that the pupil does not contract and dilate according to the influx of light and darkness as a normal pupil should, but remains fixed. I base most of my opinion on these physical conditions, that is, the asymmetry of his face and the pupillary abnormality, taken in conjunction with the history of syphilis and alcohol, lead me to believe beyond a doubt that the man was suffering from brain disease. Added to this now were the physical facts that his gait became shuffling and dragging and that there was progressive enfeeblement in this case, that he had high blood pressure and that the reflexes which physicians use as tests to see whether your nervous system is normal or not, that these reflexes were absent, therefore abnormal. So now there are other things in the hypothetical question which do not seem to have any bearing on the case, and I mention them only to leave them out. For instance, I don't believe that the fact that he took arsenic and 606 had anything to do with making his mind worse. In fact, that was given and should have been given to benefit both the physical and mental condition. The fact that he had nephritis aggravated the condition in his brain.

"Now, to sum it all up, I think here was a man who had a bad family history, had a tendency to insanity inherited from his father, lived the kind of a life which also made him tend to that. Solitude itself produces insanity, and solitary living does so. Now, then, this man later in life contracted syphilis, syphilis and arterio-sclerosis, which contracted the little blood vessels in his brain. As the blood vessels in the brain became contracted, certain areas of the brain became softened, they died out, just like certain areas of grass on that lawn would die out if they were not watered, they are deprived of nourishment, and while certain areas are good and healthy, other areas rot off and die and become destroyed, and there is no doubt in the world but what this man suffering from both syphilis and

317 Mo. Sup.—41.

arterio-sclerosis already actually had to inevitably suffer from disease of the brain, and while insanity is hard to define, it is recognized by everybody that insanity is a disease of the brain, and in this case all the physical symptoms and all the mental symptoms both large and small point to the fact that this man was an insane man, and I so believe and I firmly believe."

. Of necessity we have given large space to the evidence because of the nature of the essential issue to be determined upon this appeal. It calls for a consideration of all the evidence favorable to the plaintiffs, and not for a weighing of the evidence. The sustaining of the motion was necessarily a ruling that, giving the plaintiffs the benefit of all evidence favorable to them, and of all reasonable inferences to be drawn therefrom, the defendants as a matter of law were entitled to a verdict sustaining the will, or, what is equivalent, that there was no substantial evidence to sustain a verdict for plaintiffs. One of the grounds of the motion was that the verdict was against the evidence, against the weight of evidence and against the law under the evidence. The ruling of the court was a refusal to sustain the motion on the ground that the verdict was against the weight of the evidence. The specific ground being stated, it must be presumed that the motion was granted upon that ground alone. [Day v. Lusk, 219 S. W. 597; Millar v. Madison Car Co. 130 Mo. 517.]

In Keller v. Butchers' Supply Co., 229 S. W. 173, it was said, in the opinion by Graves, J., l. c. 175: "We do not have, in this State, the 'scintilla doctrine,' but hold that a plaintiff must exhibit substantial evidence in support of his case. The substance of the evidence is one question, but its credibility is another and different question. The appellate court, as a matter of law, passes upon the matter of substance, and not the matter of credibility. In other words, an appellate court says that this particular evidence is substantial if the jury believes it to be true. So in this case, we must say that the personal evidence of the plaintiff is substantial, if the triers of the facts believed it to be true, in the face of all the other evidence." So in the instant case, and under the action of the trial court for the reason given, the question is a matter of substance of the evidence, and not a matter of credibility of the personal evidence. By substantial evidence is meant evidence which, if true, would have probative force upon the issues, and the single issue is whether Casper Berkemeier had mental capacity to make a will at the time he executed the instrument introduced in evidence. In pursuing the inquiry the degree of mental capacity required to make a will is always to be borne in mind. The essentials were concisely stated in the opinion in Archambault v. Blanchard, 198 Mo. l. c. 426: "In determining whether a testator had sufficient capacity to make a will, this court has kept in view the standard of mental capacity required to sustain a will, and again and again it has been ruled that the testator must have had sufficient

understanding to comprehend the nature of the transaction that he was engaged in and the nature and extent of his property and the persons to whom he desired to give it without the aid of other persons. [Brinkman v. Rueggesick, 71 Mo. 553; Couch v. Gentry, 113 Mo. 248.]'' See also Crum v. Crum, 231 Mo. 626; Major v. Kidd, 261 Mo. 607; Frohman v. Lowenstein, 260 S. W. 460. Under the foregoing and many other decisions the test is not one of ability to deal with intricate and complicated matters, but that degree of mental capacity which enables the testator ''to comprehend and understand *the ordinary,* as distinguished from the intricate and complicated affairs of life.''

In Bushman v. Barlow, 292 S. W. 1039, the rule governing consideration of the evidence is stated as follows: ''In considering the demurrer, therefore, at the close of all the testimony, it becomes the duty of the appellate court to give the plaintiff the benefit of every inference which a fair-minded jury, of ordinary intelligence, might legitimately draw from the evidence. [Van Raalte v. Graff, 299 Mo. 1. c. 525, 253 S. W. 220; Burton v. Holman, 288 Mo. 70, 231 S. W. 1. c. 633; Whittlesey v. Gerding, 246 S. W. 1. c. 311, and cases; Ard v. Larkin, 278 S. W. 1068.] A reasonable and necessary limitation upon the foregoing rule to be applied in the construction of the plaintiff's testimony upon a demurrer thereto is that the plaintiff's evidence to which credence is required to be given must be of such a nature as to afford substantial proof of his contention. Forced and violent inferences not flowing from a reasonable interpretation of the facts shown, the demurrant is not required to admit. [Williams v. Railroad, 257 Mo. 1. c. 112 and cases, 165 S. W. 788, 52 L. R. A. (N. S.) 443; Van Raalte v. Graff, 299 Mo. 1. c. 526, 253 S. W. 220.]'' See also Turner v. Anderson, 236 Mo. 544.

Among the witnesses who were acquainted with Casper Berkemeier the only one who in positive terms expresses the opinion that he was of unsound mind, was plaintiffs' witness Henry Minnemann. His statements as to Casper's ill health, habits, imperfections of memory and his account of the transaction between Casper and the witness Boehm, have been given. Aside from the fact that Casper had worthless stocks of the par value of about $3800 at the time of his death, and that he sold his small stock of goods to Boehm upon easy terms as to payment, no other of his business transactions is mentioned as indicating lack of mental capacity. There was no showing that he acquired the stocks mentioned after the time when Minnemann says he began to notice that Casper was failing in mental capacity. As to the sale to Boehm, Minnemann relates that he inquired of Casper why he gave away his grocery, to which Casper replied, ''Just for fun. I was there to take care of the business if I did give it away.'' The answer was not one indicative of unsoundness of mind, neither was the transaction itself, in view of the conceded fact that Casper

himself realized that he was not able to continue the business of the store on account of his infirmities. It is somewhat significant that he realized his condition, and was possessed by no delusion at any time. The evidence is positive that in the later years of his life he was afflicted with grave bodily ailments and complained much of them, and of the pain suffered by him; his mind doubtless dwelt much upon those things, and he apparently had little belief that he would be finally cured. In that state of mind he responded slowly to the inquiries of his relatives upon his occasional meetings with them. He complained of his ailments, and in conversations asked the same questions over again. But these are not enough to show incompetency to make a will, when the testimony shows that he realized his condition, actually managed his affairs, knew what he was doing, knew to whom he was giving his property, and made his own decisions about all these matters. There is no claim that the influence of any person determined his course as to any of these things.

The matters testified to by his relatives and some others as to his way of living, his talk and his acts, fall far short of showing incompetency to make a will. The opinion of one man who knew him that he was of unsound mind, with the expression of some others that they could not just say he was of sound or of unsound mind, based upon their observations, their statements of his appearance, habits and the like as above shown, have no substantial probative force establishing mental incapacity, when they are unaccompanied by testimony of any act or fact evidencing incompetency to make a will.

It has been stated by this court many times that imperfect memory resulting from sickness or old age, forgetfulness of names of persons, the repetition of questions, and eccentricities in dress and oddities of habit are not evidence of such mental disease as renders a person incapable of making a will, when these things are not accompanied by proof of facts and of acts showing that the person is incapable of understanding the ordinary affairs of life, of transacting his ordinary business, understanding the extent of his property, and appreciating those who would be the natural objects of his bounty. [Southworth v. Southworth, 173 Mo. 59; Winn v. Grier, 217 Mo. 420; Gibony v. Foster, 230 Mo. 106; Sayre v. Trustees Princeton University, 192 Mo. 95; Bensberg v. Washington University, 251 Mo. 641.]

The testimony of the expert is to be taken into consideration along with the other evidence. No objection was made to the form of the hypothetical question, or to the statements incorporated therein. No instruction was asked or given referring in any way to the testimony of the expert, or to the facts upon which his statement was based.

In the submission of the case to the jury it was the province of the jury to determine whether the facts hypothesized had been given in evidence, and were true. It was for the jury to say how nearly

the hypothetical question reflected the personality and conduct of its subject, correctly, and as described in the testimony of the witnesses other than the expert. But, the court also heard the testimony. The court, in passing upon the demurrer of defendants, and in reconsideration of the question upon the motion for a new trial, inevitably and properly had under consideration all the evidence; and, in view of all the evidence made its ruling. Having heard not only the opinion of the expert, and his reasons for it, but also the testimony upon which the hypothetical question purported to rest, the court concluded that all of it together lacked probative force to show mental incapacity to make a will. We conclude that the court did not err in so holding.

Recurring to the statements of the reasons for his opinion we find the expert saying he based the most of his opinion upon the physical conditions, "the asymmetry of his face and pupillary abnormality" which "taken in conjunction with the history of syphilis and alcohol" led him to believe beyond a doubt the man was suffering from brain disease. But to fortify his position he states that the chief characteristic of insanity is that the man suddenly becomes different from himself. He proceeds: "If a man, for instance, has been a miser all his life, and suddenly goes out and spends his money like a drunken sailor, one knows there is something wrong with him. If a man has been a church-going, law-abiding, devoted-to-church citizen, and suddenly becomes a rake, a roue, a thief and a liar, he is beside himself; and that is taken as the greatest sign of insanity and the one which almost inevitably occurs, the change of character from one's normal self. This change took place in this individual soon after the death of the mother and the son of Mary." The trial court knew from the evidence that the mother of Casper Berkemeier died fifteen or twenty years before the death of Mary and her child; and knew there was no such change in Casper Berkemeier as that from being a miser, he suddenly went out and spent his money like a drunken sailor. Through the testimony of plaintiffs runs the statement that Casper "was close with his money." The plaintiff, his sister Elizabeth Minnemann, made that plain in her testimony. His brother, Frank Berkemeier, in his direct examination, stated the last time he saw Casper before his death was about November, 1921. He testified: "When I last saw Casper, I talked to him about his business affairs. I congratulated him upon selling the property for what he did sell it and I wished him that he would have the luck spending more of his money than what he did. He kind of laughed at me, and started talking about family affairs." Showing the conception the expert had of what was in the hypothetical question, he states in his reasons: "The hypothetical question states that from being a neat and tidy person he becomes careless about his clothes and filthy, and that from being a saving economical person he got out and be-

came a spendthrift who gave away his money, and so forth.'' The trial court doubtless had in mind the fact there was no testimony showing that Casper became ''filthy;'' that plaintiff Mary Minnemann testified concerning the room in which he lived that ''it was clean; the lady upstairs kept it clean; the time I last saw him he looked clean, but not exactly neat; his clothes kind of hung on him, and the sweater coat he had on didn't look very nice.'' Her testimony, and the testimony of her brother and of others was directly the opposite as to Casper Berkemeier becoming a spendthrift. Immediately after the statement just quoted, she said: ''He was kind of close about his money.'' The expert further pictured the moral change which came over the man, the subject of the hypothetical question, describing him as having ''lied to the doctors about his condition; spent his time in the parks with bums—men with whom in his normal moments he would not associate with.'' There was, of course, the testimony that when Casper Berkemeier went to Dr. Jost for examination in March, 1922, immediately before entering the hospital for the operation which resulted in his death, he told the doctor he had not had syphilis. The picture, however, of his spending his time in the parks with bums had for its only foundation the incident described by his brother-in-law, Henry Minnemann, who found him sitting in the park, which was two or three blocks away from where Casper lived. The only testimony given as to any one with whom Casper associated in the park was by his brother-in-law, and no reference was made by him to association with ''bums'' in the park or elsewhere.

In Sayre v. Trustees of Princeton University, 192 Mo. 95, there was expert testimony, in answer to the hypothetical question, that the maker of the will was of unsound mind. In discussing this testimony as to its substantial character and probative force, this court, speaking through GANTT, J., said, l. c. 128: ''Medical men of great learning maintain that a mind diseased on one subject must be classed as unsound, but the law of this State is too well settled to be gainsaid that a man's mind may be impaired in one faculty and practically unimpaired in all others. Derangement of mental faculties does not incapacitate one under our laws from making a will, if it does not render him unable to transact his ordinary business, and incapable of understanding the extent of his property and of appreciating the natural objects of his bounty. We have incorporated the principal hypothetical question propounded to the experts and it is apparent that many, if not all, of the facts assumed, are entirely consistent with mental soundness. Those that tended in the least to show aberration were wholly detached from the more pertinent and important evidence which completely negatived the evidence of eccentricity or any mental unsoundness. It did not include the principal and controlling facts, but we are not bound to accept an opinion based upon

facts which the law will not and does not recognize as showing a want of capacity to make a will. Conceding, as already said, that an expert might hold the view that Dr. Sayre was of unsound mind in some respects, the question and answer both fell short of the 'legal test of capacity to make a valid will in this State.''

In the instant case, the trial judge possessed of all the facts shown by the evidence, concluded, that he was not bound to accept an opinion, based in part on facts which the law does not recognize as showing incapacity to make a will, and in part upon assumptions by the witness at variance with the facts, sustained the motion for a new trial, and we cannot say he erred in so doing.

In view of that conclusion it is not necessary to discuss the claim of defendants that plaintiff' Instruction Five was erroneous, beyond saying that we have carefully considered that instruction, and hold that the giving of it was not* reversible error.

The order granting a new trial is affirmed. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur, except *Gantt, J.,* not sitting.